ELIOT et al. v. GEARE–MARSTON, Inc.

No. 9841.

District Court, E. D. Pennsylvania.

Oct. 5, 1939.

302

Paul & Paul, of Philadelphia, Pa., for plaintiffs.

John Arthur Brown, Joseph J. Brown, and D. Alexander Wieland, all of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

This matter came to trial before me without a jury. It is an equity suit, praying for an injunction to restrain a continued (but not threatened) use by the defendant of literary matter copyrighted by The Curtis Publishing Company, and seeking damages for the allegedly unlawful use of the literary matter already made by the defendant.

The plaintiff Mrs. Eliot is the author of a so-called travel article entitled "The Coastal Route to Florida." The article was published in the Saturday Evening Post (a publication of the plaintiff The Curtis Publishing Company), bearing the date January 18, 1936.

Prior to the publication, Mrs. Eliot "sold and assigned" the article to The Curtis Publishing Company. The sale and assignment transferred "all rights in and of" the article from Mrs. Eliot to The Curtis Publishing Company.

The Curtis Publishing Company obtained a copyright for the article from the Register of Copyrights, Washington, D. C., and the copyright was duly registered by the Librarian of Congress.

On or about January 20, 1936, after the publication of the article in the Saturday Evening Post, The Curtis Publishing Company duly assigned in writing to the plaintiff Mrs. Eliot all rights in the article, except American serial rights. Mrs. Eliot in her depositions conceded, under cross-

examination, that the American serial rights included the right to republish in various publications, including trade papers, or other papers which are not competitive with a first class magazine (such as the Saturday Evening Post). It may be taken for granted, therefore, that at all times relevant in this discussion, The Curtis Publishing Company possessed and retained the right to republish the article in such trade or other papers; this right, naturally, included the lesser right of granting permission to others so to republish.

During January, 1936, three letters passed between The Curtis Publishing Company and the defendant. Since their content and construction comprise the crux of the controversy, it is necessary to cite them in full. They are as follows:

Letter from defendant to The Curtis Publishing Company, dated January 20, 1936:

"In your issue of January 18, 1936, there was a story by Nina Wilcox Putnam entitled 'The Coastal Route to Florida'. The Delaware-New Jersey Ferry Company, a client of ours, have asked us if we could get permission from you to reprint this story. They want to send out these reprints to a few Automobile Clubs and Travel Bureaus, and also would like to reproduce it in a little House Organ which they issue. They would, of course, give credit to The Saturday Evening Post.

"Will you please let me know whether this could be done. We would, of course, arrange for the reprinting."

Letter from The Curtis Publishing Company to defendant, dated January 22, 1936:

"Thank you for your note of January 20th. We are sorry that we cannot grant the request of the Delaware-New Jersey Ferry Company, but it would be absolutely against our policy to allow an article from The Saturday Evening Post to be used for business promotion purposes. We have no objection, however, to the use of this article in the company's house publication, provided it is a bona fide house organ and that the article carries the following credit line: Reprinted by special permission from The Saturday Evening Post, copyrighted 1936, by The Curtis Publishing Company."

Letter from defendant to The Curtis Publishing Company, dated January 24, 1936:

"Thank you for your letter of January 22nd. The Delaware-New Jersey Ferry Company do have a bona fide house organ, and we believe they will be interested in reprinting the article that you have indicated in your letter.

"Thanking you again for your note, we are"

Defendant handled advertising for the Delaware-New Jersey Ferry Company. The house organ referred to in defendant's first letter was a publication issued by the Ferry Company. It consists of a single sheet, 16 inches long by 9 inches wide. As distributed it is folded over twice along the length of the sheet and then appears as a little pamphlet 9 inches long by 4 inches wide. The first issue of this publication had been printed in January, 1936, with 2,-000 copies, prior to the correspondence above adverted to, and prior to the time when either the defendant or the Ferry Company had seen Mrs. Eliot's travel story.

As folded for distribution, the front page of the publication bears a distinctive format. The name of the publication—Del-Mar-Va Ferry Tales—appears at the top. Directly below is a picturization of a ferry boat. Below that appears the following printed matter:

"VOL. 1. No. 1. Above—the 'Jersey Shore' operating between Pennsville & New Castle.

"Published in the interests of automobile clubs, travel bureaus, hotels and others catering to the traveling public, that they may be informed of the advantages and service offered by Delaware-New Jersey Ferry Co. and Virginia Ferry Corporation (New Castle-Pennsville Ferry) (Cape Charles-Little Creek Ferry)."

Below the printed matter appears the picture of an aeroplane with the following words below the picture:

"Ferry Co. Buys Airplane!

"The big news of the month is the purchase of a modern passenger plane by the Delaware-New Jersey Ferry Co. and the Virginia Ferry Corporation—not as an adjunct to their ferry service but as an unique service to travel bureau officials. Read details inside."

The literary content in the body of this first issue of the publication consists of the story of the chartering and subsequent purchase of an aeroplane by some ferry companies, and of a tour made in one of the

planes for the purpose of comparing travel routes. Maps showing ferry facilities are also included in the publication.

Subsequent to the above quoted correspondence between the parties, a second issue of the publication—Vol. 1, No. 2—was printed and 10,000 copies distributed in February, 1936. In this issue, under the caption "The Coastal Route to Florida," appeared excerpts from Mrs. Eliot's travel story. What corresponds to the cover of the issue is identical with that of the preceding issue, except for the printed matter underneath the picture of the aeroplane, which in the case of Vol. 1, No. 2, read as follows:

"We Acknowledge a Bouquet

"Nina Wilcox Putnam, famous author of short stories, recently motored to Florida and, at the suggestion of a friend, followed the coastal route instead of the heavily traveled No. 1 highway. She was so well pleased that she set down the history of her tour for publication in 'The Saturday Evening Post' (January 18th issue). We are reproducing Miss Putnam's story with the permission of the publishers."

This publication displayed the same maps as did the previous issue.

Vol. 1, No. 3 appeared in April, 1936, with 50,000 copies. The cover was the same, except that instead of the picture of an aeroplane and the printed matter below the picture, there appeared merely the words "Announcing the new S. S. Princess Anne". The body of this issue displayed a large picture of a steamboat, together with a description of the S. S. Princess Anne and the route it was to cover, and a comment that Nina Wilcox Putnam had traveled this route, and had written a story of the trip which was published in The Saturday Evening Post. The same maps were shown in this issue as in the two previous issues.

Subsequent to the publication of Vol. 1, No. 3 in April, 1936, the Del-Mar-Va Ferry Tales was discontinued because the quantities required exceeded defendant's original estimate, and the budget allowed was not sufficient to continue issuing the numbers regularly (see paragraph 10 of the stipulation).

In May, 1936, 10,000 additional copies of Vol. 1, No. 2, which contained the story "The Coastal Route to Florida," were reprinted, and again, in January, 1937, 10,000 additional copies of Vol. 1, No. 2 were reprinted, making a total of 30,000 copies of plaintiff's story printed. After each printing and reprinting of all of the foregoing copies referred to, they were sent directly by the printer to the ferry companies, who distributed several hundred copies of each number to their own employees, and substantially all of the remaining copies to automobile clubs, hotels, and the like.

The plaintiffs' complaint is that the partial reprint of The Saturday Evening Post article in Vol. 1, No. 2 of the publication had been published without permission: that the plaintiff Mrs. Eliot suffered damage thereby because her literary reputation was injured, and for other reasons: wherefore, the plaintiffs sought an injunction and damages.

Whether or not the defendant must respond in damages to either or both plaintiffs, depends on whether or not defendant received permission from the proper source to republish the article in the Ferry Co. publication above described: and whether or not the limits of any permission that may have been granted were transgressed.

Confining the discussion for the moment to the issue of 10,000 copies in February, 1936, I arrive at the following conclusions:

That the defendant *sought* permission from the proper source—The Curtis Publishing Company—is not denied. There is no contention on the part of the plaintiff that Mrs. Eliot's permission should have been obtained. Indeed, her own testimony shows, as already indicated, that the plaintiff, The Curtis Publishing Company, had the right to republish (or to grant permission to republish, which amounts to the same thing) the article or any part of it. The question then remains whether The Curtis Publishing Company did grant this permission. That question is resolved in the affirmative by an examination of the three letters that passed between The Curtis Publishing Company and the defendant.

That the publication in question was a house organ does not, from the testimony and the physical exhibits, admit of argument. Several officials from well-known and reputable advertising companies testified without hesitation or qualification that the publication in which Mrs. Eliot's article in part appeared was a house organ. The plaintiffs offered no testimony to the effect that the publication was *not* a house organ,

and the plaintiffs' brief does not argue that it was not a house organ. Moreover, taking into consideration the dictionary definitions vouchsafed by defendant's witnesses, and the physical appearance of the publication, I myself have no doubt that Del-Mar-Va Ferry Tales is a house organ.

The question then remains: did The Curtis Publishing Company's letter of January 22 grant permission for the use of the article? It is impossible to come to any other conclusion than that it did. The last sentence of that letter reads: "We have no objection, however, to the use of this article in the company's house publication, provided it is a bona fide house organ * * *."

By this sentence, The Curtis Publishing Company specifically granted permission for the reprinting. The plaintiffs contend, however, that what preceded the sentence quoted amounted to a qualifying condition, to the effect that the article must not be used for business promotion purposes. The plain answer to this contention is that the letter does not say so. The letter states no conditions. It contains what purports to be a declaration of policy. Considering, however, that this letter was an answer to a previous letter from the defendant which made *two* specific requests—one, that permission be given to make reprints for distribution to automobile clubs and travel bureaus, and the other, that the article be reproduced in the house organ—the statement of policy adverted to is referable to the first request as to reprints, which The Curtis Publishing Company's letter denied. As I read the Publishing Company's letter, it refuses to grant the request for reprints, stating that the use of articles from The Saturday Evening Post for business promotion purposes is against its policy: and then goes on to grant the request that the article be used in a house organ, provided it carried the conventional credit line.

The burden of proof is upon the plaintiffs to establish their case by a fair preponderance of evidence. A part of that burden is to establish the fact that the article was used in the house organ without permission. This, as readily appears from the Publishing Company's letter of January 22, the plaintiffs have entirely failed to do: obviously so, since the letter, instead of denying permission for republication in the house organ, specifically grants it.

As already indicated, however, the foregoing analysis applies only to the issue of 10,000 copies in February, 1936. As to the subsequent reprinting and distribution of 10,000 additional copies of the same issue in May, 1936, and 10,000 additional copies in January, 1937, I arrive at a different conclusion.

As previously stated, the publication of Del-Mar-Va Ferry Tales was *discontinued* after April, 1936 (see paragraph 10 of Stipulation). Thereafter, accordingly, Del-Mar-Va Ferry Tales ceased to be a house organ, since one of the fundamental characteristics of a house organ is its continuous nature. The reprintings in May, 1936 and January, 1937, therefore cannot fall within the category of the permissive right granted in The Curtis Publishing Company's letter heretofore adverted to— since they cannot be considered as being reproductions in a house organ. The house organ no longer existed as such when those two reprinting were made.

It follows that the reprintings in May, 1936, and January, 1937, were infringements; and that they were separate infringements. That they constituted separate infringements cannot be doubted: the reprintings were separated by a considerable interval of time—some eight months; and each reprinting appears to me in the light of a separate act and therefore of a separate infringement.

Accordingly, the defendant has been guilty of two infringements of copyrighted matter. It now becomes necessary, then, to discuss the question of damages from two points of view: first, who, if anyone, was damaged; and, second, the amount of damages which should be awarded.

The possibilities are:

(a) Mrs. Eliot is entitled to damages—

(b) The Curtis Publishing Company is entitled to damages—

(c) Both are entitled to damages.

An examination of the authorities reveals that Mrs. Eliot is not entitled to damages. She is not a proper party to this suit. She is not the copyright proprietor.

This suit is one for infringement of a copyright. As is evident from plaintiffs' brief, relief and damages are sought under the provisions of the Federal Copyright Law, being the Act of March 4, 1909, c. 320, 35 Stat. 1075, 17 U.S.C.A. §§ 1–63. Damages are sought under Section 25 of the Act, 35 Stat. 1081, 37 Stat. 489, 17 U.S.

C.A. § 25. The relevant portions of that statute are as follows:

"§ 25. Infringement. If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable:

"(a) Injunction. (a) To an injunction restraining such infringement;

"(b) Damages and profits; amount; other remedies. (b) To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement, and in proving profits the plaintiff shall be required to prove sales only and the defendant shall be required to prove every element of cost which he claims, or in lieu of actual damages and profits such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated * * * and such damages shall in no other case exceed the sum of $5,000 nor be less than the sum of $250, and shall not be regarded as a penalty. * * *

"Second. In the case of any work enumerated in section 5 of this title, except a painting, statute, or sculpture, $1 for every infringing copy made or sold by or found in the possession of the infringer or his agents or employees; * * *."

(Section 5 of the Act referred to in the last portion of the preceding quotation relates to the copyrighted matter involved in this case.)

A review of the history of Mrs. Eliot's article shows that although she was the author she never copyrighted the literary production, but simply transferred all her rights therein to The Curtis Publishing Company; that The Curtis Publishing Company secured a copyright thereupon, and subsequently assigned in writing to Mrs. Eliot "all rights" in the story "except American serial rights," the American serial rights comprehending and embracing reproduction such as was made by the defendant herein.

The point that must be kept in mind is that Mrs. Eliot is not and never was the copyright proprietor of the literary production involved herein. By virtue of the assignment to her by The Curtis Publishing Company of all rights except the American serial rights, she became a licensee of all rights except those reserved. As to the latter, namely, the American serial rights, the infringement of which constitutes the question in issue, she was possessed of absolutely no interest therein.

"In relation to the right to sue for an infringement, a copyright is an indivisible thing, and cannot be split up and partially assigned either as to time, place, or particular rights or privileges, less than the sum of all the rights comprehended in the copyright. Certainly the statute authorizing assignments of copyright contains no recognition of such partial assignments. Of course, such exclusive rights may be granted, limited as to time, place, or extent of privileges which the grantee may enjoy; but the better view is that such limited grants operate merely as licenses, and not as technical assignments, although often spoken of as assignments. 13 C.J. 1094; Goldwyn, etc., v. Howells, etc., C.C.A., 282 F. 9; Bobbs-Merrill Co. v. Straus, 147 F. 15, 24, 77 C.C.A. 607, 15 L.R.A.(N.S.) 766; New Fiction Publishing Co. v. Star Co., (D.C.) 220 F. 994; Public Ledger v. New York Times (D.C.) 275 F. 562; Public Ledger v. New York Times (C.C.A.) 279 F. 747; Empire City Amusement Co. v. Wilton (C.C.) 134 F. 132. As was said by the Circuit Court of Appeals for the Second Circuit in Goldwyn Pictures Corporation v. Howells, supra:

" 'The license under a copyright is analogous with that under a patent so far as (it) affects the right to sue, and beginning with the much cited case of Waterman v. Mackenzie, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923, the inability of a licensee to sue for an infringement is no longer an arguable question.'

"It follows from the foregoing that the plaintiff and not 'the Performing Rights Society' is the 'proprietor' of the copyright, and is the proper party to sue for an infringement."

M. Witmark & Sons v. Pastime Amusement Co., D.C., 298 F. 470, 474, 475.

See also Kaplan v. Fox Film Corporation, D.C., 19 F.Supp. 780.

It has already been indicated that with regards to the rights infringed in the instant case Mrs. Eliot did not possess even the status of a licensee. These rights, the American serial rights, had been expressly reserved by the Curtis Publishing Company. Accordingly, it is evident that she is not a proper party plaintiff, and therefore

not entitled to recover damages from the defendant. Prior to the adoption of the new Rules of Civil Procedure, 28 U.S.C.A. following Section 723c, a misjoinder of a party plaintiff having no interest and to whom no relief could be granted made necessary the dismissal of the complaint: See Tully et al. v. Triangle Film Corporation, D.C., 229 F. 297. However, under Rule 21 of the new Rules of Civil Procedure: "Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately." -

In the instant suit, both Mrs. Eliot and The Curtis Publishing Company are plaintiffs.

 The Curtis Publishing Company is the copyright proprietor; its copyright was infringed, as already described, by the reprints in May; 1936, and January, 1937. It claims and asks for damages (paragraph 4 of the prayers in the bill of complaint) and is entitled to them. It also asks for profits in the same paragraph. To what is it entitled?

Under Section 25 of the Copyright Law, 17 U.S.C.A. § 25, "The court may, in its discretion, allow the amounts as hereinafter stated" within the limits of a minimum of $250 and a maximum of $5,000 for each infringement; and the court may also, in its discretion, within these boundaries, assess damages at the rate of $1 for every infringing copy made by the infringer.

The Curtis Publishing Company offered no evidence as to its damages. The record shows, by The Curtis Publishing Company's own statement, that it is not interested in recovering either damages or profits for itself (Notes of Testimony, page 22). It wrote a letter to Mrs. Eliot's counsel as follows: "We are willing that you should name us as joining in the proposed suit, as owner of the copyright. We understand that any expense of such action would be assumed by Mrs. Putnam, and of course any sum collected would belong to her."

· Nevertheless, the Curtis Publishing Company is entitled to recover damages, and since the bill of complaint includes a formal prayer therefor, an award should be made to it. The award, however, will be in the nature of damages only and not of profits. The defendant is an advertising agency and produced the infringing copies for the Ferry Co. Paragraph 9 of the stipulation shows that the entire amount received by the defendant for preparing the original copy of the infringing matter and arranging for its printing was $81, which was less than the defendant's actual expenses. Obviously, the defendant made no profits for which it might account. The Ferry companies may have made profits but they are not defendants in this suit. The award, therefore, will be purely in the nature of damages.

 As to the amount of the award:

The damages can only be measured and assessed upon the basis of the damage suffered by The Curtis Publishing Company. There is no evidence that it has suffered any damage. I shall therefore award the minimum amount provided for by the statute: $250 for each infringement, or $500 in all.

 It is also proper to award counsel fees: General Drafting Co. v. Andrews, 2 Cir., 37 F.2d 54; Davilla v. Brunswick-Balke-Collender Co., 2 Cir., 94 F.2d 567; Pastime Amusement Co. v. M. Witmark & Sons, 4 Cir., 2 F.2d 1020.

 The industry and ability of plaintiffs' counsel probably deserve greater reward than will be allowed here; but under the circumstances of this case I consider that counsel fees should not be disproportionate to the award of damages. Counsel fees will therefore be allowed in the amount of $250.

 The bill of complaint also prays for an injunction. There is no evidence of any threatened continuation of the infringement, but such threat may be inferred from the evidence. The Curtis Publishing Company is entitled to a restraining decree. Mrs. Eliot, under the view I have taken of this case, is, of course, not entitled to such decree.