### WODEHOUSE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5694.

Circuit Court of Appeals, Fourth Circuit.
March 16, 1948.

DOBIE, Circuit Judge, dissenting.

———◆———

Watson Washburn, of New York City, for petitioner.

Melva M. Graney, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., and Sewall Key, George A. Stinson, and Helen Goodner, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This petition for review seeks a reversal of a decision of the Tax Court which determined deficiencies in income tax of the taxpayer in the amounts of $11,806.71 for the year 1938 and $1854.85 for the year 1941. Pelham G. Wodehouse, the taxpayer, is the well known author of numerous novels, short stories and other literary works. He is a British subject and has resided in England and in France with the exception of a period in 1936 and 1937 when he resided in California. While he was in the United States he was advised by his attorney that he could reduce his income tax liability as to earnings in this country if he would convey to his wife a one-half interest in his writings before any income was realized from them. Accordingly, in 1938, after his return to England, the taxpayer assigned to his wife an undivided one-half interest in two unpublished novels called "The Cow-Creamer" and "Uncle Fred in the Springtime;" and he notified his agent in the United States that any contracts and payments for the sale of these novels should be made for the joint benefit of himself and his wife.

On February 22, 1938, the Curtis Publishing Company, publisher of the Saturday Evening Post, accepted "The Cow-Creamer" and sent a check to the taxpayer's agent in the United States for $40,000 in payment thereof. The agreement of purchase provided that the Publishing Company purchased all rights in the story appearing in its periodical, and would obtain a copyright on the contents of its magazine, but that after publication therein was completed, it would reassign to the author on demand all rights in the story except the American (including Canadian and South American) serial rights. The Post circulates both in the United States and Canada.

On December 13, 1938, the Curtis Publishing Company accepted the novel "Uncle Fred in the Springtime" on the same terms and for the same consideration as in the case of "The Cow-Creamer."

The money paid by Curtis for the rights in these two novels was transmitted to the taxpayer's agent, which, after deducting its commission and taxes, remitted one-half the balance to the taxpayer and one-half to his wife.

On July 23, 1941, the agent sold to Hearst's International Cosmopolitan Magazine for $2,000 all American and Canadian

serial rights in an article entitled "My Years Behind Barbed Wire" written by the taxpayer; and on August 12, 1941, the agent sold to the Curtis Publishing Company the rights in "Money in the Bank" for $40,000. The rights in this novel were purchased subject to the same agreement to reassign as in the case of "The Cow-Creamer" and "Uncle Fred in the Springtime."

The Commissioner took the view that the payments above described constituted income of the taxpayer in 1938 and 1941 under Section 211(a) (1) (A) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev. Code, § 211(a) (1) (A), and assessed deficiencies accordingly. Section 211(a) (1) (A) provides that in the case of a non-resident alien not engaged in trade or business within the United States, there shall be imposed a tax upon amounts received within the United States as "interest (except interest on deposits with persons carrying on the banking business), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, *or other fixed or determinable annual or periodical gains, profits, and income * * *.*" (Italics supplied) The Tax Court sustained the Commissioner's determination.

The taxpayer contends to the contrary—that the monies received in 1938 and 1941 did not fall within the purview of Section 211(a) (1) (A), first, because they were received from persons in payment for personal property sold by him, and second, because the payments were not made in annual or periodical amounts as described in the statute, but in each instance were made in a lump sum.

The point at issue will be more clearly understood by taking account of certain amendments to the statute which were enacted in 1936. Prior to that year the taxable gross income of non-resident aliens included gross income from all sources within the United States; and a part of this income, corresponding, with the exception of dividends, to that described in Section 211(a) (1) (A) quoted above, was subject to a withholding tax. See 26 U.S.C.A. Int.Rev.Code, § 211(a) as defined in Section 119(a), and Section 143(b), 26 U.S. C.A. Int.Rev.Code, §§ 119(a), 143(b). In 1936 Section 143(b) was amended so as to add dividends to the categories of income subject to the withholding tax; and Section 211(a) was amended so that in the case of a non-resident alien not engaged in trade or business in the United States, the income tax was limited to the same categories of income to which the withholding tax applied. The effect of these amendments was (1) to exclude from the tax all gains received by such aliens from the sale of real or personal property located in the United States which theretofore had been taxable, and (2) to include dividends in the categories of taxable income.

The reasons for the changes in the statute were set out in the report of the Senate Finance Committee (S. Rep. No. 2156, 74th Cong., 2d Sess., p. 21) as follows:

"In Section 211(a) it is proposed that the tax on a non-resident alien not engaged in a trade or business in the United States and not having an office or place of business therein, shall be at the rate of 10 percent on his income from interest, dividends, rents, wages, and salaries and other fixed and determinable income, with no allowance for the deductions from gross income and credits against net income allowed to individuals subject to normal tax and surtax on net income. * * * This flat tax (in the usual case) is collected at the source by withholding as provided for in section 143. Such a non-resident alien will not be subject to the tax on capital gains, including so-called gains from hedging transactions, as at present, it having been found administratively impossible effectually to collect this latter tax. It is believed this exemption from tax will result in considerable additional revenue from the transfer taxes and from the income tax in the case of persons carrying on the brokerage business. The principal increase in revenue will result, however, from withholding tax on dividends heretofore not required."

See also the Committee Report in the House of Representatives (H. Rep. No. 2475, 74th Cong., 2d Sess., p. 9).

■ Both of the defenses offered by the taxpayer were rejected by the court in Roh-

mer v. Commissioner, 2 Cir., 153 F.2d 61, in a decision involving similar facts; but after careful consideration, we find ourselves unable to adopt that court's conclusions. In that case a nonresident author received lump sum payments for the American and Canadian magazine and newspaper serial and radio rights to one of his stories, with authority to copyright the story, but the taxpayer retained the book, motion picture and stage production rights of the story. The court held that there was no sale of personal property because (153 F.2d at page 63): "Where a copyright owner transfers to any particular transferee substantially less than the entire 'bundle of rights' conferred by the copyright, then payment therefor, whether in one sum or in several payments, constitutes royalties within the meaning of § 211 (a) (1) (A). For such a transfer is the grant of a license." This holding, as the authorities cited show, is based on the notion that a copyright is an indivisible property which cannot be split up into the parts of which it is composed, and that any attempt to do so does not amount to the transfer of separate properties to the several assignees but merely to grants of licenses. The language of some of the decisions gives seeming support to this idea, but when the exact point in controversy in these cases is ascertained, it will be seen that the courts were concerned with procedural matters and did not undertake to controvert the undeniable fact that serial rights, book rights, dramatic production rights and motion picture rights of a literary production are property rights which may be and are separately and effectively bought and sold in the literary market. The courts, however, did point out that the terms of the statute with regard to the assignment and protection of copyrights, see 17 U.S.C.A. §§ 28, 101, 112, require the holding that only the owner of a copyright may sue for its infringement because otherwise a wrongdoer might be subject to more than one recovery for the redress of one wrong since he might be subject to successive suits by different persons holding different parts of the corporate property.[1]

The authorities cited in Rohmer v. Commissioner, supra, on the indivisibility of the copyright do not show that there is anything inherent in the nature of a copyright which renders impossible the separate sales of the several parts which comprise the whole.[2] For example, in New Fiction Pub. Co. v. Star Co., D.C.S.D.

---

[1] That this is the true meaning and limitation of the rule is shown by an examination of the authorities cited in Rohmer v. Commissioner, supra, and in other decisions. The earliest expression of the rule appears in certain dicta of Lord St. Leonards in Jefferys v. Boosey, 4 H.L. 815, 993, in 1854. See also I.T. 2735, XII-2, Cum.Bull. p. 131 (1933). Keene v. Wheatley, C.C.Pa., 14 Fed.Cas. pages 180, 186, No. 7,644; Black v. Henry G. Allen Co., C.C.N.Y., 42 F. 618, 621, 9 L.R.A. 433; Empire City Amusement Co. v. Wilton, C.C.Mass., 134 F. 132; New Fiction Publishing Co. v. Star Co., D.C.N.Y., 220 F. 994; Goldwyn Pictures Corp. v. Howells Sales Co., 2 Cir., 282 F. 9; Witmark & Sons v. Pastime Amusement Co., D.C.S.C., 298 F. 470, affirmed, 4 Cir., 2 F.2d 1020. It may be noted that this view has not been unanimous. Thus, in Roberts v. Myers, C.C.Mass., 20 Fed.Cas. page 898, No. 11,-906, it was expressly stated that a copyright was divisible, and in Ford v. Charles E. Blaney Amusement Co., C.C.N.Y., 148 F. 642; Fitch v. Young, D.C.N.Y., 230 F. 743, and Public Ledger Co. v. New York Times, D.C.N.Y., 275 F. 562, af-firmed, 2 Cir., 279 F. 747, it was held that a copyright was divisible to the extent that the statute, by categorization, recognized separate or distinguishable rights comprising the copyright. See 17 U.S.C.A. § 1.

[2] The final decision on the point in the Second Circuit has not been reached without difficulty. Thus in Sabatini v. Commissioner, 2 Cir., 98 F.2d 753, the court held that the grant of exclusive world wide motion picture rights for ten years of a book by a nonresident alien author for a substantial lump sum was not a sale but a license; but in Goldsmith v. Commissioner, 2 Cir., 143 F.2d 466, the majority of the court held that a grant of exclusive motion picture rights of a play was a sale; and in General Aniline & Film Corp. v. Commissioner, 2 Cir., 139 F.2d 759, the court held that the assignment of a partial interest in a patent was a sale and not a license. To the same effect as the decision in the last mentioned case was the holding in Commissioner v. Celanese Corp., 78 U.S.App.D.C. 292, 140 F.2d 339.

N.Y., 220 F. 994, which was cited with approval in Goldwyn Pictures Corp. v. Howells Sales Co., 2 Cir., 282 F. 9, and also in Rohmer v. Commissioner, supra, the court relied upon the following quotation from Bowker on Copyrights, Its History and Its Law, Ed. 1912, p. 49, as follows [220 F. 996]:

"There can be no such thing as a copyright for a special purpose, or for a special locality, or under other special conditions, for there can be only one copyright, and that a general copyright, in any one work. But specific contracts can be made, enforceable under the law of contracts, *as for the sale* of a copyrighted book within a certain territory, provided such contracts or limitations are not contrary to other laws. Although record of assignment in the Copyright Office is provided for by the law only for the copyright in general, the separate estates, as a right to publish in a periodical and the right to publish as a book, *may be sold and assigned separately,* and the special assignment recorded in the Copyright Office, though this does not convey a right to substitute in the copyright notice a name other than that of the recorded proprietor of the general copyright, which can only be changed as specifically provided in the law under recorded assignment of the entire copyright." (Italics supplied)

The courts have been repeatedly admonished that in matters of taxation they should be governed by the substance rather than the form of a transaction and should not be diverted from the realities by undue consideration of the technical refinements of title to property. Helvering v. Hallock, 309 U.S. 106, 116–118, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368; Griffiths v. Commissioner, 308 U.S. 355, 357, 60 S.Ct. 277, 84 L.Ed. 319; Klein v. United States, 283 U.S. 231, 234, 51 S.Ct. 398, 75 L.Ed. 996; Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916. Congress has declared that the gains of nonresident aliens from the sale of real and personal property shall not be taxed; and it seems to us that the will of Congress is frustrated when that which is generally recognized in the commercial exploitation of literary works as a sale is subjected to the incidence of the tax under a different name. The inconsistency of such an assessment becomes entirely clear in this case in view of the concession that if the taxpayer had sold his entire property in his work for a money consideration, and had made an assignment of his whole copyright, he would have received no taxable income. We cannot suppose that Congress intended to exempt the proceeds of a single sale of all the rights in a literary production to one person, but to tax the proceeds of separate sales of parts of the whole.

The technical and unsubstantial nature of the opposite view is finally shown by the disappearance of any practical difficulty in the transfer and protection of the various rights in a literary work when they are separately assigned. That was accomplished in the instant case by the transfer of the right to copyright the stories to the Curtis Publishing Company under an agreement to reassign to the author all except the serial rights after the serial publication had been completed. This transfer would seem a sufficient answer to the Commissioner's contention if technicalities of title alone are considered,[3] since there is no reason to believe that the transfer was made in this form in order to avoid taxation. Our decision, however, does not rest on this basis. It rests on the inherent nature of the transfer, and on the further fact that the only ground for the indivisible theory, (that is, the inability of the assignee of a part of a copyright to sue for infringement), has been swept away by the decision of the Supreme Court in Independent Wireless Tel. Co. v. Radio Corp. of America, 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357. It was there held that an exclusive licensee of certain rights under a patent, in a suit for the infringement

---

[3] This conclusion was reached in Eliot v. Geare-Marston, Inc., D.C.E.D.Pa., 30 F.Supp. 301, wherein was held, with reference to a similar Curtis contract, that Curtis became the owner of the copyright and that the effect of the reassignment was to constitute the author an exclusive licensee of all rights other than the reserved serial rights.

of those rights, may join the owner of the patent as a codefendant if he is within the jurisdiction of the court, or as an involuntary coplaintiff if he is without the jurisdiction of the court and has refused to prosecute the suit. It has been held in the Second Circuit that this holding is applicable in the field of copyright law. See Stephens v. Howells Sales Co., D.C.N.Y., 16 F.2d 805; L. C. Page & Co. v. Fox Film Corp., 2 Cir., 83 F.2d 196; and the same rule has been incorporated in the Federal Rules of Civil Procedure, rule 19 (a), 28 U.S.C.A. following section 723c, and notes of the Advisory Committee thereto.

In addition to and apart from the conclusion that the lump sum payments received by the author were exempt from taxation since they constituted the proceeds of the sales of personal property, we are satisfied that they do not come within the positive terms of the taxing statute, Section 211(a) (1) (A), because they do not answer to the description "annual or periodical gains." This seems immediately obvious since the payment of a single sum for a right or privilege can hardly be said to be annual or periodical. The several kinds of income listed in the statute do not expressly include royalties; but Section 119(a) (4) of the Internal Revenue Code as it existed both before and after the 1936 amendments provided that gross income from sources within the United States shall include royalties for the use of copyrights in the United States. Moreover, as pointed out in Rohmer v. Commissioner, supra, the Revenue Acts from 1918 until 1936 inclusive contained a provision substantially like the present section 143(b) of the Internal Revenue Code, and the regulations interpreting this section have declared that certain kinds of income, other than those specifically listed, such as royalties, are included in the tax. See Regulations 101, Article 143–2; Article 211–7; Regulations 103, Section 19, 143–2, 3; Section 19, 211–7. Hence it is reasonable to conclude that Congress intended Section 211(a) (1) (A), as enacted in 1936, to include royalties.

The regulations, however, specify that only annual or periodical income is taxable.

For example, Treasury Regulations 101, Article 143–2, promulgated under the Revenue Act of 1938, provide as follows:

"Only fixed or determinable annual or periodical income is subject to withholding. The Act (Internal Revenue Code) specifically includes in such income, interest, dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations and emoluments. But other kinds of income are included, as, for instance, royalties.

"Income is fixed when it is to be paid in amounts definitely predetermined. Income is determinable whenever there is a basis of calculation by which the amount to be paid may be ascertained. The income need not be paid annually if it is paid periodically; that is to say, from time to time, whether or not at regular intervals. That the length of time during which the payments are to be made may be increased or diminished in accordance with someone's will or with the happening of an event does not make the payments any the less determinable or periodical. * * * The income derived from the sale in the United States of property, whether real or personal, is not fixed or determinable annual or periodical income."

The answer given in Rohmer v. Commissioner, supra, to this phase of the case is twofold. First, it is said that a royalty which is often or usually paid in installments is no less a royalty when it is disbursed in a single amount; and that the phrase "annual or periodical" is descriptive of the nature or type of income regardless of the actual manner of payment. The obvious flaw in this statement is that it ignores the plain meaning of the statutory terms. The section does not tax all payments or all royalties but only those which are "fixed or determinable annual or periodical gains"; and it is only by excising from the Act the words "annual or periodical" that the conclusion stated by the court can be reached. Indeed, that is precisely what the court does for it says in so many words, 153 F.2d at page 64: "that Congress intended the words 'other fixed or determinable annual or periodical gains, profits and income' to be interpreted to

mean 'other fixed and determinable income.' " It seems to us that this amounts to an amendment of the Act which the court is powerless to make.[4]

The second answer of the court on this branch of the case is based upon statements in the Congressional Committee Reports with reference to the 1936 amendments wherein it was said that the tax on capital gains of aliens was excluded because it was found impossible effectually to collect it, and because it was believed that the amendment would be productive of substantial amounts of additional revenue since it replaced a theoretical system impractical of administration in a great number of cases. Since the payment of a lump sum for a copyright privilege is not at all impossible to collect effectively, and since Congress sought substantial amounts of revenue by the taxation of non-resident aliens, the court concluded that lump sum payments to non-resident aliens for copyright privileges were included within the statute. The argument obviously proves too much for it would lead to the conclusion, which the regulations expressly preclude, that capital gains from the sale of real estate, which could be as easily ascertained and collected as the gains from the sale of literary property, are subject to tax. Moreover, the report of the Senate Committee hereinbefore set out makes quite clear the difficulty that the taxing authorities had previously experienced and the manner in which the losses incurred by excluding gains from the sale of real and personal property were to be made up. The report showed that the tax on capital gains, including so-called gains from hedging transactions, was to be excluded since it had been found impossible effectually to collect the tax, but that it was believed that this exemption would result in considerable additional revenue from the transfer taxes and from the income tax on persons carrying on the brokerage business, but principally from the withholding tax on dividends which for the first time were included within the purview of the statute. It is not the province of the court to impose a tax upon an item of income which Congress has considered but decided not to tax.

■ A passing reference was made in the arguments in the pending case to the fact that the Committee Reports with reference to the 1936 Amendments referred in general terms to fixed and determinable income without using the entire phrase "fixed or determinable annual or periodical * * * income"; and from this omission it was contended that the words should be interpreted as they were found in the Committee Reports rather than in the way in which they were used in the statute. It is sufficient to say that we know of no authority for the substitution of the language of a Committee Report for that of the statute to which it relates.

■ Since we have reached the conclusion that the payments received by the taxpayer were not taxable at all, we have no occasion to consider the question whether the Commissioner should have taxed less than the total amount received from the Curtis Publishing Company which covered publication rights not only in the United States but also in Canada. Nor have we occasion to consider the question whether the taxpayer could reduce his taxable income by transferring to his wife a share of the proceeds from the sale of his literary productions before publication.

Reversed.

DOBIE, Circuit Judge (dissenting).

I dissent. On the authority and reasoning of Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, I think the decision of the Tax Court of the United States should be affirmed.

[4] It is not meant to say that a lump sum payment is never subject to taxation under the statute. For example, it was held in Commissioner v. Raphael, 9 Cir., 133 F.2d 442, that interest on a judgment which was paid in a lump sum was taxable under the section because the gain involved was periodical but such a ruling can have no bearing upon a single payment which is in no way related to the period in which the right is exercised or to the contingency of subsequent performance.