WODEHOUSE v. COMMISSIONER OF INTERNAL REVENUE.

No. 5694.

United States Court of Appeals Fourth Circuit.

Argued on Rehearing Nov. 15, 1949.

Decided Dec. 21, 1949.

988

Watson Washburn, New York City, for petitioner.

Melva M. Graney, Special Assistant to the Attorney General (Theron Lamar Caudle, Assistant Attorney General, Sewall Key, George A. Stinson and Helen Goodner, Special Assistants to the Attorney General, on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case has been before us once before, 4 Cir., 166 F.2d 986. There, with one judge dissenting, we held that lump-sum payments, received in 1938 and 1941 by nonresident alien author from domestic publisher under agreement requiring publisher to obtain copyright on contents of its periodical and reassign to author on demand after serial publication had been completed all rights in story except American serial rights, were not within revenue statute imposing tax on dividends, etc., or other fixed or determinable "annual or periodical gains," but were exempt as proceeds from sales of "personal property." 17 U.S.C.A. §§ 28, 101, 112; 26 U.S.C.A. §§ 119(a), 143(b), 211(a) (1) (A).

The stories in question, written by Wodehouse (hereinafter called taxpayer), were "The Cow Creamer" and "Uncle Fred in the Springtime." Certiorari was granted by the United States Supreme Court, 335 U.S. 807, 69 S.Ct. 34. Then the Supreme Court (three justices dissenting), 337 U.S. 369, 69 S.Ct. 1120, reversed us and the majority opinion, 337 U.S. at page 395, 69 S.Ct. at page 1132 ended with these words: "For the foregoing reasons, we hold that the receipts in question were required to be included in the gross income of the respondent for federal income tax purposes. The judgment of the Court of Appeals accordingly is reversed and remanded for further proceedings consistent with this opinion."

Circuit Judge Soper's opinion in our Court, 166 F.2d at page 992, concluded thus: "Since we have reached the conclusion that the payments received by the taxpayer were not taxable at all, we have no occasion to consider the question whether the Commissioner should have taxed less than the total amount received from the Curtis Publishing Company which covered publication rights not only in the United States but also in Canada. Nor

have we occasion to consider the question whether the taxpayer could reduce his taxable income by transferring to his wife a share of the proceeds from the sale of his literary productions before publication."

Accordingly, we are now called ôn to decide the two questions left undecided in our previous opinion: (1) Was taxpayer entitled to a deduction because the total amount paid to him by the Curtis Publishing Company included serial rights to the two stories not only in the United States but also in Canada; and (2) Was taxpayer entitled to deduction by virtue of the fact that after the stories were completed (but before either publication or copyright) he assigned a one-half interest in the stories to his wife, Ethel Wodehouse. Both these questions were decided adversely to the taxpayer by the Tax Court of the United States.

The Tax Court's holding here on the first question was based almost entirely upon the following extract, from the opinion of that same Court in Sax Rohmer, 5 T.C. 183, which was affirmed 2 Cir., 153 F. 2d 61, certiorari denied 328 U.S. 682, 66 S.Ct. 1367, 90 L.Ed. 1632: "At the time the licensing agreement was settled upon the parties apparently made no effort to segregate the value paid for the United States rights from that paid for the Canadian rights. The circulation figures do not furnish a sufficient basis upon which we could determine that any of the income was derived from sources outside the United States. Since there is no basis upon which we could properly make any allocation, it follows that the full amount must be deemed to be from sources within the United States."

Besides the Sax Rohmer case, the Tax Court cited only Estate of Alexander Marton, 47 B.T.A. 184. The Circuit Court of Appeals in the Sax Rohmer case, speaking through Circuit Judge Frank, 153 F.2d at page 65, said: "The publishing company acquired for $10,000 both the American and Canadian serial rights. If the taxpayers had shown that more was paid than would have been if the Canadian rights had not been acquired, then, to that extent, there would have been no tax since

the additional amount paid would not have been a royalty for the use of the copyright in this country. But taxpayers, who had the burden, offered no direct proof on that subject. An obvious and easy source of such proof, had the facts been as taxpayers contended, would have been the testimony of one of the editors of Liberty Magazine, but none of those editors was called as a witness. Instead, the taxpayers offered proof that the United States circulation of the magazine was 2,302,296 and the Canadian, 190,622, and testimony to the effect that from $1,000 to $1,500 each had been paid by some magazines for Canadian serial rights to the works of other lesser authors. The Tax Court decided that this evidence did not 'furnish a sufficient basis upon which' it could 'determine that any of the income was derived from sources outside the United States.' Although, if we were called upon to decide that question of fact, we might regard the evidence as sufficient, we cannot say that the Tax Court unreasonably refused to do so. For, at best such evidence would lead to conjectural inferences."

And, at the end of the opinion, 153 F.2d at page 65, is appended this note: "Thus advertisers might pay little more, and perhaps nothing more, for the small Canadian circulation; they might believe that publicity directed to 190,622 Canadians had nothing remotely like the value of similar publicity directed to the same number of dwellers in this country. Amounts paid to authors for Canadian serial rights to certain stories might throw a very dim light on the value to a magazine of the Canadian serial rights to Rohmer's story."

We are more deeply impressed by the reasoning of Circuit Judge Learned Hand in his concurring opinion in Molnar v. Commissioner, 2 Cir., 156 F.2d 924, 926–927: "It seems to me that in Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, we overruled sub silentio, Cohan v. Commissioner, 2 Cir., 39 F.2d 540, a decision which had stood for sixteen years, had been often cited, never with disapproval I think. Moreover, Rohmer v. Commissioner, supra, so far as I can see, is directly contrary to

Helvering v. Taylor, 293 U.S. 507, 513, 515, 55 S.Ct. 287, 79 L.Ed. 623, which I had supposed decided that, when it appeared that a taxpayer was entitled to something, it was an error for even the Tax Court to deny him any allowance whatever, although of course we should be bound to accept whatever that allowance might be. Here it is clear beyond doubt that the payments were made in some part for the foreign copyrights; · yet the Tax Court has refused any allowance at all because Molnar has not shown how much; and I am unable to understand my brothers' reasoning by which they reconcile that result with the law, as I understand it was before Rohmer v. Commissioner, supra. However, I think that only in the rarest instances should we overrule so recent a decision of our own court, however much in a court differently constituted the judges may disagree with it; for it is as much the function of the Supreme Court to decide differences within a circuit as between circuits. Therefore I yield to the authority of Rohmer v. Commissioner, supra, and what I am now saying is only to record my personal disagreement." See, also, Hochschild v. Commissioner, 2 Cir., 161 F.2d 817, 820.

In its opinion below, the Tax Court stated: "So here, there is no evidence of record disclosing that when the publishing company accepted the stories of the petitioner under the agreement indicated in the memoranda of acceptance, it and the petitioner (or the petitioner's agent), made any effort to segregate the value of the Canadian rights from the United States rights. In the cases at bar, the petitioner offered testimony showing the relative circulation of the magazines in the United States and Canada, the dates of publication of the literary productions and the opinion of the literary agent as to the value of the Canadian rights. These collateral evidential facts do not afford us a reliable basis for assigning and fixing a value, if any, to the Canadian rights. · The parties to the contract were best able to make a proper allocation and segregation of the respective values. They neglected or chose not to do so. The omission, or failure, of such proof can not be corrected by a guess as to the value of a right which may have no value at all. We sustain the respondent's contention on this issue."

We quote from the testimony given in the Tax Court by Paul Reynolds, the literary agent of taxpayer, who represented taxpayer in dealing with the Curtis Publishing Company.

"Q. How long has your firm been literary agents? A. Since 1893.

"Q. Are you familiar with the sales of stories in Canada and the United States over the period of years in which you have been in business? A. Yes, I am.

"Q. Have you made sales yourself in behalf of authors both in Canada and the United States? A. Yes, we made sales individually in Canada and occasionally individually in the United States, much more rarely.

"Q. And frequently have you made sales together? A. Often together but there are very few magazines in this country who will buy American rights without Canadian.

"The Court: I cannot understand you.

"The Witness: We often made sales of American and Canadian rights, and we have made sales of Canadian· rights, and we have occasionally, but very rarely, made sales of American serial rights solely. Nearly all the American books in the country circulate in Canada and they would not buy a story unless they could buy Canadian as well as American rights, but there are today one or two who do not circulate in Canada, only here.

"Q. Have you ever sold Canadian serial rights alone of an author as well known as Mr. Wodehouse? A. No, not that I can recall. Their magazines are small, and wouldn't be able to pay anything like what he could get in this country, and the magazines that pay him in this country would go to Canada, and would want Canadian rights. Often, if we cannot sell a story in this country, we sell it in Canada.

"Q. What is the most you have ever received for an author's book rights in Canada alone? A. Book rights or serial?

"Q. Serial rights to a book? A. I think $1,500 is the most that I can recall.

"Q. Was that for an author not so prominent as Mr. Wodehouse? A. Nowhere near."

Incidentally, Reynolds was asked to value the Canadian rights here involved but was not permitted by the Tax Court to answer this question.

 It would unquestionably have been the more desirable procedure had Reynolds, instead of contracting for a lump sum for both the Canadian and United States rights, specified a specific sum to be paid by Curtis for the Canadian rights and another specific sum for the rights in the United States. Nevertheless, a few facts seem to be clear. Without the Canadian rights, the magazine containing taxpayer's stories could not have been circulated in Canada. The Canadian rights had some value. The Tax Court cannot shrink from valuing rights merely because (as is so often true) there is a difficulty in fixing a value on these rights. And we think, under all the circumstances in this case, some part of the lump sum paid by Curtis was paid for the Canadian rights, apart from the United States rights. It certainly seems a fair economic inference that when two things, each having a value in itself, are sold for a lump sum, that a part of this lump sum was paid by the buyer for each of these two things.

We do not hold, as taxpayer claims, that he was entitled to a deduction of at least 6% of the total price paid by Curtis for both Canadian and United States rights. Nor do we hold that taxpayer's deduction is to be a precise part of this total sum, exactly in proportion to the circulation of the magazines in Canada and the circulation in the United States.

We do hold, however, that a part of the total price paid by Curtis was for the Canadian rights; and that taxpayer was entitled to a deduction of that part, to be fixed by the Tax Court in the light of the circulation figures, the informed testimony of Reynolds and the economic common sense of the entire situation here presented. Accordingly, we must remand the case to the Tax Court for a determination, in the light of our opinion, of the amount of the deduction to which taxpayer is entitled. Either party may take additional testimony upon the remand.

Our holding as to the Canadian rights is in line with the dissenting views of Circuit Judge Swan in the recent decision of the United States Court of Appeals for the Second Circuit in Wodehouse v. Commissioner, 2 Cir., 177 F.2d 881. That case (though a different story was involved) concerned the same author and the facts were substantially similar to the facts in the case now before us. Said Circuit Judge Swan, in his dissenting opinion in that case: "In my opinion the testimony of Mr. Reynolds furnished sufficient evidence that the purchaser bought the Canadian rights, as well as the American, and that the Canadian rights had some independent value. Accordingly I think it was an error for the Tax Court to refuse to allocate any part of the purchase price to the Canadian rights and I would remand the cause with directions that such an allocation be made."

 This brings us to the assignments, after the stories were written but before copyright, made by taxpayer to his wife of a one-half interest in each of the stories, "The Cow Creamer" and "Uncle Fred in the Springtime." We must affirm the decision of the Tax Court that these assignments, for federal income tax purposes, were ineffective. Our decision here is placed on the ground that, for income tax purposes, these assignments lacked economic reality.

Certain facts surrounding these assignments, we think, shed no little light on their inherent actualities. Taxpayer first attempted to split his American income between himself and his wife on the score of the community property theory between husband and wife. This attempt was abandoned on the advice of counsel. Then, again on advice of counsel, taxpayer, with meticulous adherence to external form, executed the assignments for the purpose

of tax avoidance. Notices of these assignments were sent to Reynolds, the literary agent, with instructions that the proceeds from the sale of the stories, or any rights therein, were to be equally divided between taxpayer and his wife. And, in accordance with these instructions, after the Curtis Publishing Company had paid the agent for the serial rights, separate checks were sent by the agent to Wodehouse and to his wife.

It should be noted, however, that no notice whatever of these assignments was given to the Curtis Publishing Company, the one concern vitally interested in knowing the identity of the owner of literary properties to whom it was paying (for those properties) a large sum of money. Further, the contract of acceptance (negotiated through Reynolds) by Curtis provided that Curtis would obtain the copyright on the stories and then Curtis would reassign all rights except the serial rights, not to Wodehouse and his wife, but solely to the *author*, Wodehouse.

Usually, upon a complete assignment of an interest in property, the assignee acquires a complete right and power over this interest, including the right and power of the assignee to transfer this interest to a third person. No such right and power was contemplated here. There would, of course, be an inherent economic difficulty in selling an undivided one-half interest in a story not yet copyrighted. Taxpayer alone had all the dealings with his agent, Reynolds (to whom apparently plenary authority was given), and Reynolds, in turn, dealt with Curtis as the agent of Wodehouse alone, and Curtis sent its check for the whole price of the serial rights to Reynolds. Apparently, the entire role played by the wife in this little tax drama was that of a receiver of one-half of any pecuniary proceeds received from the sale of the stories or any rights therein. In reality, then, taxpayer, in substance not in form and in spirit not in letter, attempted merely to assign to his wife a share in his future income. And that, for federal income tax purposes, is not permitted.

There was evidence, too, that taxpayer and his wife maintained a joint bank account. The evidence does not show that the proceeds here involved were deposited in this joint bank account. If, however (as is not improbable), these proceeds were so deposited, it is crystal clear that, after all was said and done, the taxpayer would find himself in precisely the same situation which would have obtained had there been no assignment whatever.

It has long been the law, as it should be, that for federal income tax purposes, transfers within the family group for tax avoidance are regarded with suspicion and subjected to a close scrutiny by the courts. As we said in Mauldin v. Commissioner, 4 Cir., 155 F.2d 666, 668: "We do not mean that all reallocations of income within a family group are to be set aside for tax purposes. But such arrangements, to be recognized, must have a reality and substance which is not found in the instant case."

Again, in Commissioner v. Kohn, 4 Cir., 158 F.2d 32, 34, we said: "The circumstances are merely external garments that clothe the transactions, outward trappings at best. In no way do they condition the essential verities. The approach to a tax statute is functional, not conceptualistic. We are concerned rather with the result actually achieved than with the subtle means or devious methods used to bring this result to pass." See, also Moore v. Commissioner, 4 Cir., 170 F.2d 191; Wilson v. Commissioner, 4 Cir., 161 F.2d 556.

Our Court stated in Home Furniture Co. v. Commissioner, 4 Cir., 168 F.2d 312, 313: "It is an elementary principle of federal income tax law that an anticipatory assignment of income, whatever its guise, will not absolve the assignor from income tax liability. * * * Income is taxable to its creator and controller, not to its collector."

And see, Doyle v. Commissioner, 4 Cir., 147 F.2d 769.

In the leading case of Helvering v. Clifford, 309 U.S. 331, 335, 60 S.Ct. 554, 557, 87 L.Ed. 788, Mr. Justice Douglas stated:

"But this dilution in his control would seem to be insignificant and immaterial, since control over investment remained. * * * We have at best a temporary reallocation of income within an intimate family group. Since the income remains in the family and since the husband retains control over the investment, he has rather complete assurance that the trust will not affect any substantial change in his economic position."

And compare the remarks of Mr. Justice Holmes in Lucas v. Earl, 281 U.S. 111, 114-115, 50 S.Ct. 241, 74 L.Ed. 731, where he decried an "arrangement by which the fruits are attributed to a different tree from that on which they grew." See, too, Hash v. Commissioner, 4 Cir., 152 F.2d 722; Losh v. Commissioner, 10 Cir., 145 F.2d 456, 457.

We do not think the taxpayer here is helped by the Supreme Court's recent decision in the well known case of Commissioner v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210. The gist of that case is found in the following extract from the opinion of Chief Justice Vinson, 337 U.S. at page 742, 69 S.Ct. at page 1214: "The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case [Commissioner v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135], but whether, considering all the facts— the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent— the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."

We have considered "all the facts"; we have decided this question upon the entire picture, as we see it. And so we must affirm the decision of the Tax Court on this point, which is adverse to the taxpayer.

In the very recent case of Wodehouse v. Commissioner, decided by the United States Court of Appeals for the Second Circuit (referred to above in connection with the Canadian rights), a different decision from ours was reached by a majority of the Court (Circuit Judges L. Hand and Swan) with Circuit Judge Clark dissenting. With all due deference to that distinguished Court, we prefer the reasoning of the dissenting opinion to the reasoning of the majority opinion. This majority opinion of Judge Swan contains this statement [177 F.2d 884]: "The respondent asserts that this case falls within the rule that formal assignments of property, of which the assignor by virtue of his control remains in substance, or for practical purposes, the true owner, are not operative to relieve the assignor from tax on the income from the property which is paid to his assignee. He contends that the situation is essentially the same as in Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81. We think that case distinguishable. There the donor assigned the right to collect insurance commissions on a contract already performed by him. Here the donor had no contract right to royalties when he made the gift."

We think this contention is answered by Judge Clark in his dissenting opinion: "'The power to dispose of income is the equivalent of ownership of it,' Helvering v. Horst, 311 U.S. 112, 118, 61 S.Ct. 144, 147, 85 L.Ed. 75, 131 A.L.R. 655; and my brothers concede, as in the light of Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81, they must, that if Wodehouse had given his wife a half-interest in the royalties after he had sold the novel, the income would be taxable to him. To let him escape taxation because the assignment was made *before, rather than after, the assured sale of the novel* seems to me to rely on the kind of nice distinction which the Supreme Court has often told us is not to be permitted to inhibit the taxing power. Our decision seems to me to provide a very easy way around taxes from property, over which

in the eyes of the world the taxpayer retains full control." (Italics ours.)

For the reasons stated, as to the Canadian rights, the decision of the Tax Court of the United States is reversed and the case is remanded to that Court for further proceedings consistent with our opinion, with right of either party to take additional testimony upon the remand. As to the assignment by taxpayer to his wife, the decision of the Tax Court of the United States is affirmed.

Reversed and remanded in part; affirmed in part.

SOPER, Circuit Judge (dissenting in part).

In that part of the opinion of the court which requires the Commissioner to determine the value of the Canadian rights assigned to the Curtis Publishing Company, I concur.

I dissent from the holding that the assignments of a one-half interest in the stories by Wodehouse to his wife lacked legal validity. It is said that the assignments lack "economic reality" because of the failure of the sales agent to notify the purchaser of the assignments, the existence of a joint bank account in the name of husband and wife, and the suspicion aroused in the court's mind when transfers are made in the family group to diminish taxes; and the conclusion is reached that the transfers were merely attempts on the taxpayer's part to assign to his wife a share in his future income.

It is undisputed, however, that written assignments of the stories were executed and sent to the agent who collected the purchase price and sent one-half to the husband and one-half to the wife. There is no evidence that these substantial sums were deposited in the joint bank account or that the wife did not retain complete control over her share. The economic realty of the transaction is therefore plain unless the transfers were fraudulent in design and execution, and the court does not venture to go that far. The burden of proof was on the Commissioner to show fraud.

It cannot be said that a husband may not make a gift to his wife so that the income subsequently earned on the property conveyed is taxable to her. There was no transfer of future income in the pending case because the property conveyed consisted of the stories which were completed when the transfers were made. Blair v. Commissioner, 300 U.S. 5, 57 S. Ct. 330, 81 L.Ed. 465.

The Commissioner's present attitude in this case is the result of a reversal of position on his part. Originally he recognized the validity of the assignment after an investigation, and did not attempt to include the wife's one-half interest in the assessment against the husband. It is noteworthy that the pending case is stronger for the taxpayer than that in the Second Circuit, where a decision in his favor was rendered on this point, because there the burden of proof rested on him to establish the bona fides of the transfers. The fact that the burden of proof was on the taxpayer in that case weighed heavily in the mind of the dissenting judge.