COMMISSIONER OF INTERNAL REVE-
NUE v. CELANESE CORPORATION
OF AMERICA.

No. 8570.

United States Court of Appeals
District of Columbia.

Argued Dec. 10, 1943.
Decided Jan. 17, 1944.

Mr. Joseph M. Jones, Sp. Asst. to the Atty. Gen., with whom Messrs. Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to the Atty. Gen., were on the brief for petitioner. Messrs. J. P. Wenchel, Chief Counsel, and C. E. Lowery, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., also entered appearances for petitioner.

Mr. E. Barrett Prettyman, of Washington, D. C., with whom Messrs. Fred R. Angevine, of New York City, F. G. Awalt, and Raymond Sparks, both of Washington, D. C., were on the brief, for respondent.

Before GRONER, C. J., and EDGERTON and DOBIE,* JJ.

GRONER, C. J.

This is a tax case in which the Commissioner determined deficiencies against respondent, as a withholding agent, of $14,074.20, with penalties of $3,518.55 for 1937, and of $7,253.08 and penalties of $1,831.27 for 1938. The Tax Court held that there was no duty on respondent to withhold the tax. The Commissioner appealed. The question in the case is whether payments made by respondent to one Henri Dreyfus, a nonresident alien, were subject, in the two years in question, to the income tax withholding provisions of the Revenue Acts;[1] and the answer turns upon whether the payments were royalties for the use of patents or were payments on their purchase price.

The facts were stipulated in the Tax Court and for present purposes may be stated as follows:

Henri and Camille Dreyfus were in November, 1918, citizens and residents of Switzerland. They had invented and owned certain secret manufacturing processes upon which patents had been granted by the United States. On November 30, 1918, they contracted with respondent's predecessor corporation to assign and deliver to it all of such patents, with full and exclusive right and authority to manufacture and sell in the United States, its territories and dependencies, Mexico, Cuba and South America. The contract was executed by the Dreyfuses in London. A cotemporaneous contract provided for their employment as Managing Directors of the corporation for a period of fifteen years. Pursuant to the terms of the first mentioned contract, the Dreyfuses executed written assignments of "the whole of the exclusive right, title and interest in and to each and all of said letters patent * * * and in and to the inventions therein described and claimed, the same to be held by the said, the American Cellulose & Chemical Manufacturing Company, Ltd. (respondent's predecessor), for its own use and behoof and for the use and behoof of its successors, assigns, or legal representatives, subject to the terms and conditions of the said agreement of the 30th of November, 1918."

Camille Dreyfus subsequently became an American citizen and is not concerned with the appeal. His brother, Henri Dreyfus, continued a nonresident alien and at no time had an office or engaged in any trade or business in the United States.

In 1937 and 1938 respondent paid Henri Dreyfus $140,742.04 and $72,530.79, respectively, under the 1918 sales contract. It did not withhold income tax on these payments. If the payments were made in the purchase of personal property, as was decided by the Tax Court, then respondent is not subject to the income tax withholding provisions.[2] But the Commissioner claims that the payments were not purchase money payments, but were in fact royalties for the use of patents, (Sec. 119, Acts 1936, 1938, 26 U.S.C.A.Int.Rev.Acts, pages 876–879). If that be true, then admittedly respondent would be subject to the withholding provisions of the Act.

The November, 1918, sales agreement, after reciting the circumstances under which the Dreyfuses obtained the patents and that respondent, called "the Purchaser", desired to acquire them "to use, enjoy and exploit them in the Purchaser's area," provided that in consideration of the delivery by the Purchaser to the sellers of 150,000 shares of the Purchaser's fully paid, non-assessable common stock and the payment of six per cent (three per cent to each of the brothers) of the Purchaser's net profits to be paid in each year in which there should be payments of dividends to stockholders—"The Vendors hereby assign and make over to the Purchaser and its successors and assigns, the said processes and the full benefit thereof with the full and exclusive right and authority to manufacture and sell in the Purchaser's area, namely, in the United States of America, its territories and dependencies and also similar rights in Mexico, Cuba, and the countries of South America provided patents are taken out by the purchasers in any

---

* Sitting by assignment of the Chief Justice of the United States, pursuant to the provisions of the Act of December 29, 1942, entitled "An Act to amend the Judicial Code to authorize the Chief Justice of the United States to assign circuit judges to temporary duty in circuits other than their own." 56 Stat. 1094, 28 U.S.C.A. §§ 17–20, 22, 23.

[1] § 143 (b), Revenue Act of 1936, 49 Stat. 1700; and § 143 (b), Revenue Act of 1938, 52 Stat. 511, 26 U.S.C.A. Int.Rev.Code, § 143(b).

[2] Treasury Department Regulations (Art. 212–1 (a) of Regs. 94, 101, etc.)

of the said countries in which purchasers may wish to do business (but not elsewhere) articles made under, by or in accordance with the said processes or any of them," etc.

And the stipulated facts show that in accordance with the quoted provision, the Vendors did assign in writing the whole of their exclusive right, title, and interest in the patents within the described territory to the Purchaser, and that the assignments were accepted and recorded in the United States Patent Office and that the Purchaser has uninterruptedly had and used the same and their extensions as its own property for a quarter of a century.

■ Considered in this aspect there can be no manner of doubt that the parties intended to effect a purchase and sale of the patents and not a royalty use.[3] The 1918 contract confirms this purpose in unmistakable language, and this was the conclusion reached by the Tax Court. The stipulation, that Court said, categorically provides that the patents and processes covered in the 1918 contract were transferred to the petitioner before the tax years in question; and there is no reason to believe that when the parties drew their contract they intended to provide for licenses and royalties when they expressly provided for sale and price.

■ This reasoning seems to us in all respects sound, and when it is considered that we were recently told by the Supreme Court,[4] that the judicial function is exhausted when there is found to be a rational basis for the decision of the Tax Court, the conclusion reached by that Court, supported, as here we think it is, by the stipulated facts and the established law, necessarily forecloses the question, unless there is something else in the record which of itself impels a different result. The Commissioner's case is, in the main, based on such a claim. He says that, notwithstanding the words of outright conveyance and sale, or the intention of the parties to make a purchase and sale, there are in the contract restrictions and limitations on the transfer which indicate that it was in law no more than a licensing agreement. To support this he points to various provisions from which he concludes that an absolute sale was not accomplished, since, as he thinks, respondent might, as the result of one or another of these provisions, in the contingencies named, lose the patents and the Vendors recover them. We find no merit in the claim. Most of the language to which the Commissioner alludes embraces precautionary provisions in the protection of the rights of the parties, respectively, under the contract. None of it affects the intent and purpose of the contract to vest immediately in the Purchaser absolute title to the patents. The clause most seriously challenged by the Commissioner is that the Vendors shall have the right to cancel the agreement and terminate the rights of the Purchaser if within ten

---

[3] Littlefield v. Perry, 21 Wall. 205, 220, 221, 22 L.Ed. 577; United States v. General Elec. Co., 272 U.S. 476–489, 47 S.Ct. 192, 71 L.Ed. 362; Rotorite Corp. v. Commissioner, 7 Cir., 117 F.2d 245; Commissioner v. Hopkinson, 2 Cir., 126 F.2d 406, 409, 410.

[4] Dobson v. Commissioner, 64 S.Ct. 239, 88 L.Ed. ——.

In the last cited case Mr. Justice Jackson very well says that no administrative decisions are entitled to greater weight than those of the Tax Court. I am in accord with the statement, but its significance to me lies in the reason given to sustain it. This is, that the Tax Court "is independent, and its neutrality is not clouded by prosecuting duties. Its procedures assure fair hearing. Its deliberations are evidenced by careful opinions. * * * It has established a tradition of freedom from bias and pressures. * * * Its members not infrequently bring to their task long legislative or administrative experience in their subject. * * * Individual cases are disposed of wholly on records publicly made, in adversary proceedings, and the court has no responsibility for previous handling."

That the given reason indubitably impels the conclusion, no intelligent person will gainsay. And if this be true, why then should it not be a rule of general application? Why, if the present trend of diminishing power in the courts to review administrative decisions is to continue—as I think is implicit in the recent decisions of the Supreme Court—would it not materially aid in the re-establishment of public confidence, alike in all administrative tribunals, if the pattern of fitness so carefully drawn by Mr. Justice Jackson were adopted by the legislature and written into their respective constitutions? Certainly, no less than this will afford protection to the citizen in the lawful pursuit of his business, and it should not be forgotten that protection and patriotism, in the true spirit of union, are reciprocal. In this paragraph I speak only for myself.

years from the date of the agreement the Purchaser shall be dissolved and placed in bankruptcy or receivership. A quick answer to this is that the ten year period expired in 1928, without the happening of any of the conditioned events. The installment payments on the purchase price and the ownership rights of the Purchaser under the contract have continued unchallenged until now. Obviously, no right to demand a reconveyance of the patents can arise now under this clause. At most, the provision was intended to fix a definite period within which to determine whether the enterprise would succeed, with the right reserved to the Vendors, at their option, to retake in the event of bankruptcy. But, in no aspect, was this more than a condition subsequent whereby a title already vested might become divested. Since the named contingency never arose, and the condition long ago became obsolete, no more need be said on the subject. (Restatement, Property, Sec. 24). Other language provides that in the event of liquidation, the Vendors shall be entitled to the payment of a capital sum representing the capitalized value of the percentages payable to the Vendors, but does not provide for a return of the patents. And so also the provision that the Purchaser will keep the patents in full force and effect, in default of which the Vendors have the right at the Purchaser's expense to work the patents, is just another condition subsequent—looking to requiring the Purchaser to make such continuous use of the patents that the installments of the purchase price may be paid. In short, the various provisions to which we have referred, as well as the others referred to by the Commissioner, are provisions of a reciprocal nature in which each of the parties was seeking the most certain means of securing to the Purchaser the exclusive possession and use of the patents which it had bought and to the sellers that they should be so used as to assure as far as possible payment of the installments which were a part of the consideration of the sale. Nor is there any more substance to the Commissioner's claim that the clause which bound the Vendors, if called on by the Purchaser and at the Purchaser's expense, to take proper action to prevent any one, acting without Purchaser's sanction, from using the patents, is in derogation of the rights of Purchaser as owner. This pro-

vision reserved no rights in the Vendors and while it may have been redundant, its purpose obviously was to cover contingencies which might at the moment have been overlooked or not foreseen. But clearly it was to protect the interest of Purchaser against such contingencies as should arise. As counsel very well suggest, it was analogous to a covenant to defend title, a common provision in most deeds of conveyance of real property.

■ The Commissioner's final point—not raised or discussed in the Tax Court but which, in deference to the decision of the Supreme Court in the Hormel case,[5] we notice—is that even if the transfer was technically a full assignment, the payments under the contract are nevertheless subject to the broad provisions of the withholding statute section 143(b). The argument to support this theory is that the duty of withholding is not determined by ascertaining that the payments are "technical royalties," but that the obligation exists in any case in which a seller of an invention still has an interest in the successful exploitation of the patent. But the trouble with this is that the statute itself makes the distinction and expressly declares a different rule for "royalties for the use of a patent" and for payments received in consideration of "the sale of personal property" which would necessarily include the sale of a patent. § 143(b), § 119(e), Revenue Acts of 1936 and 1938, respectively. The Treasury Regulations make this distinction clear. Article 212–1–(a) of Regulations 94 and 101 provides that the gross income of a nonresident alien individual not engaged in trade or business within the United States and not having an office or place of business therein at any time during the taxable year, does not include profits derived from the effecting of transactions in the United States, including inter alia, *profits derived from the sale within the United States of personal property or real property located therein.* And Article 143–2 of Regulations 94 and 101 provides that the income derived from the sale in the United States of property, whether real or personal, is not fixed or determinable annual or periodical income; and hence not subject to the 10 per cent tax under the provisions of section 143(b) on income from annual or periodical gains and profits. Nothing more, we

---

[5] Hormel v. Helvering, 312 U.S. 552, 556, 557, 61 S.Ct. 719, 85 L.Ed. 1037.

think, need be said to show the error of the argument on which the Commissioner's case in this last respect rests. Accordingly, we are of opinion that the Tax Court was clearly right in holding the amounts paid by respondent corporation to Dreyfus were installments of the purchase price of the patents covered by the 1918 contract and were not royalties or income from which respondent was required to withhold the tax.

Affirmed.