**ETERPEN FINANCIERA SOCIEDAD DE RESPONSABILIDAD LIMITADA v. UNITED STATES.**

No. 50242.

United States Court of Claims.

Nov. 4, 1952.

Madden, J., dissented.

William A. Patty, New York City, for plaintiff. Shearman & Sterling & Wright, and Thomas P. Ford, New York City, were on the briefs.

J. H. Sheppard, Washington, D. C., with whom was Acting Asst. Atty. Gen. Ellis N. Slack, for defendant. Andrew D. Sharpe, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

█ The taxpayer, Eterpen Financiera Sociedad de Responsabilidad Limitada,[1] an Argentine corporation not engaged in trade or business within the United States, brings this action for the recovery of income taxes totalling $115,822.21 which are alleged to have been erroneously withheld under the provisions of section 144 of the Internal Revenue Code, 26 U.S.C. § 144, by Eversharp, Incorporated, and Eberhard Faber Corporation from payments due the taxpayer for the use of its United States patents on the Biro ball pointed fountain pen and writing paste. Inasmuch as the laws of Argentina accord to citizens of the United States the right to prosecute claims against the Government of Argentina in the courts of that country, the taxpayer is entitled under the terms of the Act of June 25, 1948, ch. 646, § 1, 62 Stat. 976, 28 U.S.C. § 2502, to maintain this action against the United States. Cf. Sudametal Sociedad Sud Americana v. United States, 90 F. Supp. 551, 116 Ct.Cl. 789, 790. Because the facts giving rise to these payments are not in dispute, both parties seek summary judgment on the question of law.

The pleadings, affidavits, and exhibits establish that in 1945 the taxpayer was the possessor of certain United States patents and pending patent applications on a ball pointed fountain pen known as the "Biro Pen," and on a pulpy ink or writing paste for use in this pen. As the taxpayer was not engaged in business in the United States, it elected on May 18, 1945 to enter into an agreement, entitled "License Agreement," with Eversharp, Incorporated, and Eberhard Faber Corporation whereby it granted to these companies jointly the exclusive license under its United States patents "to make, use and vend" the devices and materials made from and in accordance with the patents throughout the United States, Hawaii, and Alaska during the full life of the patents. The terms of the agreement provided *inter alia:* (1) that the licensees thereto might terminate the agreement at any time after it had been in effect for seven and one-half years, or at the end of any calendar year thereafter, upon giving six months advance notice in writing of its intention to do so; (2) that the licensees by joint action could sublicense others to make, use or vend the devices and materials; (3) that the licensees would not attempt to "pirate" sales outside the license area since the taxpayer reserved to itself the remaining world rights; (4) that the licensees would use all due vigor and diligence to create and exploit a market for the invention; (5) that the licensees or either of them might sue in the licensor's name for infringement and damages to the inventions, subject to the right of the licensor to intervene and take part in any and all such suits; (6) that any money recovery from infringement and damage suits should be applied first to the payment of the costs of the action, second to the payment to the licensor of royalties on the infringing sales, and the balance to be retained by the licensees; (7) that the licensees would pay to the licensor at the end of each calendar quarter of each year the agreement remained in force, *as royalties,* a sum equivalent to 5¼ per centum of their net sales prices of all ball pointed pens, replacement parts, and ink produced under the taxpayer's patents, less certain designated expenses; (8) that the obligations of the licensees to pay the designated royalties should be both joint and several; and (9) that the licensees should deduct from royalty payments any

---

[1] On November 29, 1946, the taxpayer's name was changed from Eterpen Sociedad Anonima Financiera to Eterpen Financiera Sociedad de Responsabilidad Limitada.

amounts required by the then present or future laws of the United States to be withheld for taxes.

Simultaneously with and in consideration of the execution of the license agreement the parties entered into a further agreement under which the taxpayer granted to the licensees individually and jointly an exclusive option to purchase for the area embraced in the license agreement the entire *right, title, and interest* in and to the patents and patent applications covered by the license agreement for the lump sum of $1,500,000.[2] By its terms this option expired on March 1, 1946, but was subsequently extended by mutual consent of the parties. Pursuant to this agreement, on December 1, 1946, Eversharp exercised on its own behalf the right to purchase from the taxpayer the patents and patent applications covered by the license agreement. Although the option agreement called for a purchase price of $1,500,000, the taxpayer agreed at this time to accept $1,100,000 in view of the fact that the "royalty payments" by Eversharp and Faber for 1946, the first year of production, had exceeded $450,000.[3] Since Faber did not desire to participate in the purchase of the patents, Eversharp, by means of a supplementary agreement, consented to continue to recognize Faber's rights as licensee under these patents.

Shortly after the parties entered into the license agreement of May 18, 1945, both the taxpayer and Faber requested rulings from the Commissioner of Internal Revenue as to whether the agreement would be regarded as a license of the patent and the payments called for therein as royalties subject to withholding at the source under the provisions of 26 U.S.C. §§ 143 (b) and 144, or whether the agreement would be construed as an assignment of the patent and the payments as installments on the

purchase price, and therefore not subject to any tax. Pending this decision, Eversharp elected to withhold 30 per centum of the gross amount of the installments paid to the taxpayer during the taxable year 1946. This sum, which totalled $121,038.02, was paid to the Chicago Collector of Internal Revenue on August 15, 1947. Similar withholdings totalling $25,298.90 were made by Faber from installments due the taxpayer and were remitted to the appropriate Collector. A total of $146,336.92 was withheld in this manner.

On December 22, 1947, the Commissioner of Internal Revenue ruled that the payments called for by the license agreement were in fact royalties and sustained the withholding of income taxes on these sums at their sources by the licensees. However, the Commissioner further determined, upon grounds not disclosed by the present state of the record, that $30,514.71 of the amount previously withheld should be refunded to the taxpayer. Thereafter, on January 12, 1949, the taxpayer filed with the appropriate Collectors claims for refund of the balance of the withheld tax, $115,822.21, contending that the sums payable to it under the license agreement of May 18, 1945 constituted installment payments of the purchase price for the patent rights allegedly "purchased" jointly by Eversharp and Faber, and that accordingly withholding and payment of the tax at the source was not required. Following the rejection of these claims by the Commissioner of Internal Revenue, the taxpayer brought suit in this court, relying upon the same grounds for recovery.

Sections 143 (b) and 144 of the Internal Revenue Code under which the sum in dispute was withheld, provide in part that:

> "§ 143 (b). All persons, in whatever capacity acting, * * * having the control, * * * or payment of * * * dividends, rent, salaries, wages, * * *

---

2. On May 5, 1945, Eversharp and Faber, in contemplation of the execution of the license agreement and option agreement with Eterpen, executed an agreement setting forth their respective rights and duties as joint licensees. The agreement provided that Eversharp would produce

the pens and ink to be sold by Faber, and that Faber might acquire up to 25 per centum of Eversharp's production.

3. The purchase price included $50,000 for the Canadian patent rights which had been licensed to Twoco Corporation, Ltd., a subsidiary of Eversharp.

compensations, * * * or other fixed or determinable annual or periodical gains, profits, and income * . * * of any nonresident alien individual, * * shall * * * deduct and withhold * * * a tax equal to 30 per centum thereof, * * *.

"§ 144. In the case of foreign corporations subject to taxation under this chapter not engaged in trade or business within the United States, there shall be deducted and withheld at the source in the same manner and upon the same items of income as is provided in section 143 a tax equal to 30 per centum thereof, * * *."

Section 231 of the Internal Revenue Code, 26 U.S.C. § 231 (a) (1), contains a similar provision which states that:

"§ 231 (a) (1). There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 13 and 14, upon the amount received by every foreign corporation not engaged in trade or business within the United States * * * as interest * * * dividends, rents, salaries, wages, * * * compensations, * * or other fixed or determinable annual or periodical gains, profits, and income, a tax of 30 per centum of such amount, * * *."

Sections 29.231–1 and 29.231–2 of Treasury Regulations 111, promulgated under section 231, supra, provide as follows:

"§ 29.231–1 (a). * * * For the purposes of section 231 (a), the term "amount received" means "gross income." Specific items of fixed or determinable annual or periodical income are enumerated * * * but other fixed or determinable annual or periodical gains, profits, and income are also subject to the tax, as, for instance, royalties. * * *

"§ 29.231–2 (a). A nonresident foreign corporation is taxable under section 231 (a) only on fixed or determinable annual or periodical gross income received from sources within the, United States. Its taxable income

does not include * * * profits derived from the sale within the United States of personal property or real property located therein."

As indicated above, the taxpayer takes the position that even though the agreement of May 18, 1945, was entitled "License Agreement," its terms, whereby the taxpayer granted to the licensee the exclusive right to make, use, and vend the inventions embraced therein, constituted, under well defined principles of patent law, a joint assignment or sale to Eversharp and Faber of the taxpayer's patents and pending patent applications. From this the taxpayer argues that the payments provided for in the agreement were installment payments of the purchase price for personal property, rather than determinable annual income, i. e., royalties, arising from the use of its patent rights, and hence were not subject to taxation under the withholding provisions set forth above. In support of this position, the taxpayer relies principally upon the decision of the Tax Court in Edward C. Myers, 6 T.C. 258, where the license agreement was in many respects similar to the license agreement executed by Eterpen. Moreover, the taxpayer insists that the option agreement contains nothing to negative the present transfer of the patent rights purportedly achieved by the license agreement, but instead was designed only to provide an alternative method of paying the purchase price by substituting a lump sum payment for the periodic installments.

It is defendant's contention that the license and option agreements, having been executed simultaneously, must be read and construed together in order to determine the true character of the contract and of the payments in question. When all the factors surrounding this transaction are viewed in this perspective, defendant says it is apparent that the so-called license agreement was not intended to, and did not in fact, amount to an assignment of the patent rights. Also, defendant urges that the agreement in the Myers case, supra, is distinguishable from the agreement in the instant case.

Both the legal consequences and the tax consequences of agreements transferring interests in patents have been thoroughly defined by the courts. When a United States patent is issued, the patentee acquires the exclusive right to *make, use, and vend* the invention or discovery in the United States for a period of 17 years. R.S. § 4884, as amended, 35 U.S.C.A. § 40. Under the leading decision of the Supreme Court of the United States in Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923, it is settled law that when the patentee enters into an agreement to transfer a particular right or interest in his patent, the true nature and effect of the agreement does not depend upon the name by which it calls itself, but upon the legal effect of its provisions. Lamar v. Granger, D.C., 99 F.Supp. 17; Cleveland Graphite Bronze Co., 10 T.C. 974, affirmed per curiam, 6 Cir., 177 F.2d 200; Parke, Davis & Co., 31 B.T.A. 427. Thus, ordinarily when the patentee enters into a contract to transfer the right to make, use, and vend the patent rights exclusively to another, he disposes of all that he has by virtue of the patent and the transaction amounts to a sale even though the instrument of transfer is called a license rather than an assignment. Kimble Glass Co., 9 T.C. 183.

The instrument of transfer in the Myers case, supra, was of this type. Myers had patented a rubber-coated flexible steel track which he desired to transfer to his employer, B. F. Goodrich Rubber Company. Accordingly, he entered into a license agreement which was similar in many material respects to the license agreement executed by the taxpayer in the instant case. Under the circumstances of that case the Tax Court concluded that the grant of an exclusive license by Myers to make, use, and vend his invention constituted a sale of patent rights for federal income tax purposes and that the annual royalty payments did not reduce its character to a

license, but rather were annual installments on the purchase price. Cf. Bloch v. United States, D.C., 102 F.Supp. 457; Halsey W. Taylor, 16 T.C. 376; Carl G. Dreymann, 11 T.C. 153; Bessie B. Hopkinson, 42 B.T.A. 580, affirmed, 2 Cir., 126 F.2d 406. The fact that Myers reserved the right to terminate the agreement was held not to be incompatible with the conclusion that a sale resulted from the transaction, but instead was regarded merely as a condition subsequent to the transfer of title.[4] Cf. Allen v. Werner, 5 Cir., 190 F.2d 840; Commissioner of Internal Revenue v. Celanese Corp., 78 U.S.App.D.C. 292, 140 F.2d 339.

In the instant case, however, other factors are present which were not involved in the Myers case, and which in our opinion make that decision distinguishable. It is true that a license to make, use, and vend a patented device gives rise to an assignment of a patent where the document granting such a license is consistent with a present intent by the owner to transfer the patent. If, however, there are present in the license agreement itself, or in some closely related document which must be considered a part of the same transactions, factors which expressly negative the intent to make a transfer of the patent, the transaction cannot be held the equivalent of an assignment. Rhodes-Hochriem Mfg. Co. v. International Ticket Scale Corp., D.C., 57 F.2d 713; Federal Laboratories, Inc., 8 T.C. 1150. Several such factors are present in this case.

Foremost among these factors is the option agreement which was executed simultaneously with the license agreement. These two instruments, executed as they were at the same time, must be construed together in ascertaining the intention of the parties in making their contract. Littlefield v. Perry, 21 Wall. 205, 88 U.S. 205, 220, 22 L.Ed. 577. When these two instruments are considered together, they negative in

---

4. At first the decision in the Myers case was acquiesced in by the Commissioner of Internal Revenue, 1946–1 Cum.Bull. 3, but later this acquiescence was withdrawn effective June 1, 1950. Mim. 6490, 1950–1 Cum.Bull. 9. The import of these rulings by the Commissioner need not be determined in this case, in view of our conclusion that the Myers decision is distinguishable.

clear and unmistakable terms the contention by the taxpayer that it intended to effect a sale of the patents by means of the license agreement alone. In the option agreement the taxpayer expressly warranted that it was "the sole and exclusive owner of the entire right, title, and interest in and to all of the patents," and that it had "the full right and power to assign and transfer the same." But if the taxpayer's present theory with respect to the license agreement were adopted, these words in the option agreement become meaningless, and the option agreement itself worthless because the taxpayer would have had nothing left to convey to Eversharp upon the exercise of the option on December 1, 1946. It is highly improbable and illogical that such a result was intended by the taxpayer when these agreements were drafted.

An additional factor which persuades us that the taxpayer did not intend the license agreement of May 18, 1945, to be an assignment is the fact that it conferred equal rights upon Eversharp and Faber as joint licensees. If that agreement had been intended to be an assignment, Faber would have become a joint assignee and owner of the patent rights in the designated areas. It is evident that the licensees did not believe such a result had been achieved as Eversharp and Faber entered into an agreement following Eversharp's exercise of the option whereby Eversharp agreed *to continue* to recognize Faber's rights as *licensee*.

Another indication that the taxpayer did not intend the license agreement to effect an assignment lies in the fact that the taxpayer did not expressly confer upon the licensees the right to sue for infringement of the patents in their own names. Such a right, had it been granted, would have been persuasive evidence that the taxpayer intended to convey all the rights it possessed. Pike v. United States, D.C., 101 F.Supp. 100. Here, however, the licensees only received the right to sue for infringement in the taxpayer's name, which they were entitled to do in any event. Independent Wireless Telegraph Co. v. Radio Corporation of America, 269 U.S. 459, 46 S. Ct. 166, 70 L.Ed. 357.

It is indeed difficult to believe the taxpayer's contention that the sole purpose of the option agreement was to provide an alternative means of paying the purchase price for an assignment of the patents when it went to great efforts to couch the license agreement in terms of licenses and royalties. If such had been the taxpayer's intention at the time the agreements were drafted, the same result could have been achieved far more clearly and by the much less cumbersome means of one agreement rather than by the two agreements actually used. In addition, the agreements failed to incorporate a provision for applying the royalty payments toward the fixed purchase price. We think it is certain that such a provision would not have been omitted if the option agreement had been intended only to supplement a completed assignment by supplying an alternative means of paying the purchase price. Cf. Rotorite Corp. v. Commissioner, 7 Cir., 117 F.2d 245, reversing 40 B.T.A. 1304.

Upon full and careful consideration of all the documents and agreements referred to above, and of the other material facts and circumstances, our conclusion is that the taxpayer did not assign or sell its entire interest in the patents by means of the license agreement of May 18, 1945. No valid reason has been put forth to warrant our disregarding the significance of either the language or of the type of agreements selected by the taxpayer. Therefore, we hold that the situation here was entirely different from that in the Myers case, supra, and that the payments called for in the license agreement were actually royalties for the use of the taxpayer's invention. As royalties, these payments constituted a form of determinable annual income to the taxpayer, and were correctly subjected to the withholding provisions of section 144 of the Internal Revenue Code, supra, by the licensees, Eversharp and Faber. The taxpayer is not entitled to a refund of the sums withheld, and its motion for summary judgment is denied. Defendant's motion

for summary judgment is granted, and plaintiff's petition is dismissed.

It is so ordered.

JONES, Chief Judge, and WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting).

The opinion of the court pays its respects to the doctrine that parties cannot, by the form and language in which they couch a transaction, prevent it from having the legal consequences of what it really is. Thus a potential taxpayer cannot by language and labels suggested by a skillful lawyer, avoid the taxes which would be due if the transaction were correctly labeled and contained straightforward language. But the doctrine, as I understand it, works both ways. If the transaction is mislabeled so that superficially it appears to be taxable, but is actually a non-taxable transaction, the Government has no right to insist upon taxing it as if it were correctly labeled.

In the instant case, I think the question is whether the plaintiff, by the transaction evidenced by the documents summarized in the opinion of the court, parted with the ownership of the patents, in the designated geographical area. If it did, the transaction was a sale, and non-taxable. Treasury Regulation 29.231–2(a) says specifically that the tax statute here in question "does not include * * * profits derived from the sale within the United States of personal property or real property located therein."

If the plaintiff did not part with all of its interests in the patents, what interest did it retain? The court mentions the fact that the taxpayer, in the agreement in question, did not expressly confer upon Eversharp and Faber the right to sue in their own names for infringement of the patents. I would have supposed that the question of whether the victim of a wrong can sue the wrongdoer in his own name or must sue in the name of someone else, such as an assignor, trustee, guardian, husband, etc., is determined by the law and is not the subject of private agreements. And in the instances which I have cited, it has nothing to do with the real ownership of the right. I am not helped then, by the omission of an attempt to confer upon Eversharp and Faber a right to sue infringers in their own names any more than I would have been helped by its inclusion, in determining who really owned the patents.

The principal reliance of the court is upon the option agreement made simultaneously with the license agreement. The plaintiff's contention, in substance, is that the option conferred by this agreement was only the option to pay a lump sum of $1,500,000 and thus escape the liability for paying a percentage of the sales prices which might have been and at the time the option was exercised, gave prospect of being greatly in excess of the lump sum stipulated in the option. I see in the option agreement nothing more than that. Suppose one has a lease for 17 years on a piece of land. He "licenses" another to use and occupy the land exclusively for the full period of his lease, paying him twenty percent of the gross income which he obtains from the land. The agreement contains also an option in the second party to, within the first two years of the term, pay a lump sum of $10,000 and thereby free himself from any further payments of a percentage of the income. Before, and after, and whether or not, the option is exercised, the transaction is a sale of the seventeen year leasehold, and payments made thereunder are not taxable under the statute here in question.

The court's opinion considers the fact that Eversharp and Faber were joint "licensees" as an indication that the transaction was truly a license. As I see it, the fact is not significant. Eversharp and Faber were made joint owners of the patents by the agreements, each paying the plaintiff a percentage of the proceeds of its sales. Under the option they could pay the stipulated lump sum and thereby extinguish their liability for further percentage payments. Eversharp desired to do this, Faber did not. Those two companies thereupon made an agreement that when Eversharp had made the lump sum payment extinguishing fur-

ther percentage payments to the plaintiff, Faber would make its percentage payments to Eversharp. Both still had the same substantive rights in the patents which they had had from the beginning. The fact that one of them paid off the vendor in full, and the other agreed to pay that one off in installments, was a natural arrangement having no bearing on the question of who, in reality owned the patents.

I find nothing which indicates a license agreement except labels and words. The substance of the transaction is not consistent with the labels and words. I think the taxpayer should not be penalized for using the wrong labels and words, just as he would not be rewarded for doing so, if they indicated non-taxability of a transaction whose substance was taxable.