Joe L. SCHMITT, Jr., and Helen N. Schmitt, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16341.

United States Court of Appeals Ninth Circuit.

Oct. 15, 1959.

302

Ash, Bauersfeld & Burton, Robert Ash, Carl F. Bauersfeld, Washington, D. C., for petitioners.

Charles K. Rice, Asst. Atty. Gen., C. Guy Tadlock, Lee A. Jackson, Robert N. Anderson, George W. Beatty, Attys., Dept. of Justice, John M. Morawski, Sp. Atty., I. R. S., Washington, D. C., for respondent.

Before BARNES and HAMLEY, Circuit Judges, and ROCHE, District Judge.

BARNES, Circuit Judge.

The crucial question in this case is whether for income tax purposes an agreement executed by the taxpayer [1]

1. Reference is to Joe L. Schmitt, Jr. His wife is a party only because joint returns were filed.

constituted a sale of patent rights, and income derived therefrom was therefore long term capital gain; or whether the contract constituted a license, and hence income derived therefrom ordinary income. ◆

■ The Tax Court held [2] there was not a sale of all substantial rights in and to the patent, and hence the income was taxable as ordinary income. The taxpayer appeals. This Court has jurisdiction.[3]

Joe L. Schmitt, Jr. engaged in accounting work in Arizona for many years. He developed a procedure (described as Exact-O-Matic System) which was an automatic, mechanical process or accounting method, using tabulating cards and electrical circuits (a special wiring unit invented by taxpayer) to evaluate single entry information and convert that information into double entry records and accounting statements.

During the years in question (1949, 1950 and 1951),[4] taxpayer entered into eleven substantially similar agreements whereby he transferred to assignees certain rights in certain specified territorial areas.

In return for said assignments, taxpayer received payment in two forms— first, "lump sum payments" of $7,962.02, $36,992 and $10,997, respectively, in the three tax years in question, and second, in the two latter years, $7,498 and $1,799, respectively, for the licensing by the territorial assignees of sublicenses or "District Franchises" located within the original assigned territory. These latter, or "paragraph 6(b) royalties," were reported by the taxpayer as ordinary income and are not involved in this appeal.

Both parties to this litigation recognize, as did the Tax Court, the intent of Congress in enacting this legislation with respect to the assignment of patent rights to establish a "realistic" test as to whether or not a "sale" had taken place; that "the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones." [5] And see the quotation of the Tax Court judge of his own language in Rose Marie Reid, 1956, 26 T.C. 622, 632 (supported by cases there cited).

Using such test, the Tax Court concluded "that petitioner retained, in the aggregate, such continuing right and interest in the system as to preclude (recognizing) these transactions as sales." The court's opinion specified fifteen rights reserved, or limitations upon that which was assigned. These are set out in abbreviated form in the margin.[6]

---

2. Joe L. Schmitt, Jr., 1958, 30 T.C. 322.

3. Int.Rev.Code of 1954, §§ 7482–7483, 68A Stat. 890–891 (1954), 26 U.S.C. §§ 7482–7483 (1958). Int.Rev.Code of 1939, Ch. 27, § 1001(a), 44 Stat. 109 (1926) as amended 26 U.S.C. §§ 1141–1142 (1952).

4. Technically, the same statutes are not applicable to all three years. The government equates the language of the several applicable statutes stating: "It is clear that if taxpayer failed to transfer 'all substantial rights' within the meaning of Section 117(q), he also failed to effect a 'sale' under Section 117(a) (4) * * *." [Appellee's Brief, p. 12.] With this we agree. Int.Rev.Code of 1939, ch. 247, § 117(a) (1) and (4), 53 Stat. 50; § 117(q) (1) and (4), Act of June 29, 1956, ch. 464, § 1, 70 Stat. 404, 26 U.S.C.A. § 117.

5. S.Rep. No. 1622, 83d Cong., 2d Sess., pp. 439–440 (3 U.S.C. Cong. & Adm.News (1954) 5083). This report was actually issued in connection with Section 1235 of the 1954 Code, 26 U.S.C.A. § 1235, but it is relevant here since Section 117(q) was enacted in 1956, after the adoption of Section 1235, for the purpose of making the provisions of Section 1235 retroactive to 1950. S.Rep. No. 1941, 84th Cong., 2d Sess., p. 5, U.S.Code Congressional and Administrative News 1956, p. 2914 (1956–2 Cum.Bull. 1227, 1229).

6. Summary of rights not transferred:
   (a) Assignor had veto on further assignment of territorial franchise by assignee; unlimited in any way.
   (b) Assignee agreed to grant licenses and divide franchise area with districts upon conditions agreed to by assignor.

The government urges that these "restrictions" are enough to support the Tax Court's decision, relying on William M. Bailey Co., 1950, 15 T.C. 468 (1950), affirmed per curiam, 3 Cir., 1951, 188 F. 2d 360, and more particularly, Watkins v. United States, 3 Cir., 1958, 252 F.2d 722.

Additionally appellee points out that the provisions of paragraph 12 of the agreement here go further than the facts of Bailey v. Com'r, supra, in that there the agreement provided that the assignee company would prosecute or defend any infringement suits at its own expense. In the contract before us, paragraph 12 requires the assignor to so defend.

■■■ The general law is well established. An assignment of the exclusive right to manufacture, use, and sell a patented article within the United States or a specified area thereof amounts to a sale of the patent rights, and the income therefore is taxable as long-term capital gain, provided the invention is a capital asset and has been held for the required period. Anything less is a license. Whether payment is made in a lump sum or over a period of time is immaterial. Waterman v. Mackenzie, 1890, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923; Arthur C. Ruge, 1956, 26 T.C. 138. But this applies to an *exclusive* right (or an undivided part or share in that exclusive right). A transfer which is not exclusive, or is limited (other than territorially), becomes a license and not an assignment. Waterman v. Mackenzie, supra; Watson v. United States, 10 Cir., 1955, 222 F.2d 689; Vincent A. Marco, 1955, 25 T.C. 544, 548; Edward C. Myers, 1946, 6 T.C. 258. "Where he [the patentee]

(c) Requirement that franchise area be districted within thirty days.

(d) A minimum number of district licenses were required to be sold.

(e) Assignor had right to approve assignee's licensee (or his successor, in event of licensee's death), and such licensees (*district* franchise holders) were required to:

(i) pay royalties, and render monthly reports;

(ii) exhibit books to assignor;

(iii) be supervised by assignee;

(iv) obtain approval of assignor to any transfer.

(f) Assignee could assign to licensee only at specified minimum prices.

(g) Licensees were required to pay a minimum royalty.

The *territorial* franchise holder (taxpayer's assignee) was limited by (e), (f) and (g) above, and further,

(h) agreed to furnish taxpayer detailed monthly reports of sales and royalties, and duplicate orders of new business;

(i) keep books open to audit and examination;

(j) was required to supervise licensees.

(k) Territorial franchise could be terminated upon failure to pay share of sales and royalties.

(*l*) Taxpayer furnished course of instruction and training to "all personnel" of territorial franchise holder, who was in turn required to instruct and train licensees.

(m) Taxpayer agreed to obtain and furnish equipment.

(n) Taxpayer agreed to furnish all sample forms "now or hereafter in use under Exact-O-Matic procedure."

(*o*) Taxpayer agreed to defend suits against patents.

We agree with taxpayer that (*l*), (m), (n) and (*o*) above, in the absence of reciprocal restrictions on the (obligations) territorial franchise holder created by the agreement, were "plus" obligations on the taxpayer which did not restrict the territorial franchise holder's use or right to sell. But there were reciprocal obligations created, and placed on the territorial franchise holder. Under (e) above, and paragraph 9 of the agreement, not only was taxpayer required to instruct all personnel of the territorial franchise holder, but that person, in turn, was required to instruct and train its licensees; and, under paragraph 7, "supervise" its licensees, and "use their [its] best efforts and ability to promote and preserve the said business" of each sublicensee.

The franchise holders also agreed to sell certain numbers of sublicenses, within specified times on terms laid down by the taxpayer (¶¶ 3, 4 of agreement; (c), (d) and (e) above), to approved licensees ((e) above).

If the territorial franchise holder failed to pay over certain proceeds from the sale of district licenses, and other fees, the taxpayer had the right to terminate the agreement on thirty days' notice.

transfers less than all three rights to make, use and vend for the term of the patent, or transfers them nonexclusively, the transfer is a mere license and does not convey any title in the patent itself." Kimble Glass Co., 1947, 9 T.C. 183, 190, quoted in William M. Bailey Co., 15 T.C. 468 at page 484. But there are exceptions to the Waterman rule.. United States v. Carruthers, 9 Cir., 1955, 219 F.2d 21; Allen v. Werner, 5 Cir., 1951, 190 F.2d 840; Kavanagh v. Evans, 6 Cir., 1951, 188 F.2d 234.

Here the eleven substantially similar agreements used the terms "Assignor" and "Assignee." They did not purport to grant the exclusive right to "make, use and vend." Assignor granted unto assignee "the exclusive right, privilege *and franchise* to use and sell (not to manufacture) the said Exact-O-Matic System," during the entire term of said patents, *"subject however, to the conditions and covenants hereinafter set forth."* (Emphasis added.)

■ Admittedly, the nomenclature used to describe the contract and the parties thereto, has little, if any, value or significance in resolving the question whether there was an assignment or a license. How or what the parties are designated does "not fix, limit, or qualify the scope and effect of the grant." [7]

■ Nor do we hold the transfer of the exclusive right to use and sell, without the right to manufacture, establishes as a matter of law there was no sale. Whether the right to make is "substantial" often becomes a factual question, to be determined according to the facts and circumstances of each case and the peculiarities inherent in each patent.[8] To this extent we distinguish the leading case of Waterman v. Mackenzie, supra. And see Parke, Davis & Co., 1934, 31 B.T.A. 427.

The case of Dairy Queen of Oklahoma Inc. v. Commissioner of Int. Rev., 10 Cir., 1957, 250 F.2d 503, is heavily relied on, as it should be, by appellant. Some of the facts are strikingly similar, even to the reporting by the taxpayer of gallonage royalty as ordinary income and lump sum payments due under the same agreement as long-term capital gains.[9] On the facts of that case, the majority of the court in the Dairy Queen case ruled there was a sale.[10]

7. Watson v. United States, 10 Cir., 1955, 222 F.2d 689, at page 691, and cases cited.

8. See Lawrence v. United States, 5 Cir., 1957, 242 F.2d 542, where testimony was received as to the purpose in deleting the assignment of the right to sell, and where the court held the question of substantiality was one of fact for the jury.

9. The patentee granted an exclusive license "to use, manufacture, sell and distribute" a patented freezing and dispensing machine in several states to one McCullough. McCullough in turn licensed the corporate taxpayer in the state of Oklahoma. The corporation then entered sublicenses, agreeing: (a) to furnish two freezers to sublicensees, retaining title; (b) to supervise installation; (c) to furnish formula; (d) to be responsible for production; (e) to assist in obtaining supplies; (f) to train personnel. The corporate taxpayer's licensee (a) furnished the premises; (b) agreed to maintain certain standards; (c) agreed to certain designs and construction; (d) paid $1,875 as a lump sum for the use of the freezers;

(e) paid thirty-five cents per gallon of mix.

10. "But we do not think that conveyance of the whole or an undivided part of the patent is essential to the valid sale of a property right or capital asset which included, as an integral part thereof, only the right to use the patent. Instead, the franchise agreement purported to convey the exclusive and perpetual right to make and sell a trade-marked product within a designated territory. That right was undoubtedly a property right, one subject to sale as such—a capital asset, if you please. And, it was none the less so because it involved the beneficial use, but not the right to make and sell the patent. See Lawrence v. United States, 5 Cir., 242 F.2d 542.

"Of course if the conditions and restrictions upon the exercise of the granted right were such as to reserve in the grantor the proprietary right in the franchise, the grant would be something less than a sale and probably a mere license. But the traditional test of ownership is the power to exclude others. Taxation is not concerned with refine-

Judge Lewis, in dissenting, came to the opposite conclusion on those same facts.

While we might be inclined to favor the reasoning of the dissent in the Dairy Queen case, we need not pass on the facts of that case here, nor overrule it. The facts in the present case are similar, but not identical.

Nor do we quarrel with the legislative history defining "all substantial rights to a patent." [11] Just as the Senate

ments of title, but with actual command of the property. See Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Griffiths v. Helvering, Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319.

"The requirements of the franchise with respect to maintenance of quality; sanitary dispensing conditions; design of stores; right to audit the books; approve source of 'mix'; and cancellation for violation of such requirements, were all intended to insure uniform standards for the trade name product sold statewide. So long as the grantee complied with these conditions subsequent, the grantor could not invade the grantee's exclusive right to make and sell the products in his designated territory. Each and all of these conditions were designed to protect and safeguard the respective rights of the parties. They were not intended to reserve to the grantor any property or proprietary right in the exclusive and perpetual franchise. Nor do we think the provisions with respect to the gallonage payments impair such exclusive right. Cf. Watson v. United States, supra.

"We conclude that the transactions amounted to a sale of a capital asset * * * "

250 F.2d at page 506.

11. See F. H. Philbrick, 1956, 27 T.C. 346 at pages 355–356, where the Tax Court says:

"The meaning of the phrase 'all substantial rights to a patent,' used in said subsection (q), is explained in the report of the Senate Finance Committee on the cognate provisions of Section 1235 of the 1954 Code, as follows:

" 'The section does not detail precisely what constitutes the formal components of a sale or exchange of patent rights beyond requiring that all substantial rights evidenced by the patent (other than the right to such periodic or contingent payments) should be transferred to the transferee for consideration. This requirement recognizes the basic criteria of a "sale or exchange" under existing law, with the exception noted relating to contingent payments, which exception is justified in the patent area for "holders" as herein defined. To illustrate, exclusive licenses to manufacture, use and sell for the life of the patent, are considered to be "sales or exchanges" because, in substantive effect, all "right, title, and interest" in the patent property is transferred (irrespective of the location of legal title or other formalities of language contained in the license agreement). Moreover, the courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to "use" the invention has not been conveyed to the licensee, if it is shown that such failure did not represent the retention of a substantial right under the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones. The word "title" is not employed because the retention of bare title in a transaction involving an exclusive license may not represent the retention of a substantial right in the patent property by the transferor. Furthermore, retention by the transferor of rights in the property which are not of the nature of rights evidenced by the patent and which are not inconsistent with the passage of ownership, such as a security interest (e. g., a vendor's lien) or a reservation in the nature of a condition subsequent (e. g., a forfeiture on account of nonperformance) are not to be considered as such a retention as will defeat the applicability of this section. On the other hand, a transfer terminable at will by the transferor would not qualify.'

"The phrase 'rights to a patent,' appearing in said subsection (q), appears also in section 1235 of the 1954 Code. The reports of the Senate Finance Committee and of the Conference Committee on this latter section indicate that such phrase was substituted, in lieu of a previously suggested phrase reading 'rights evidenced by a patent,' in order to make clear that the section applied, even though the patent itself might not have been issued at the time of the transfer, and even though an application for the patent might not then have been made."

Finance Committee felt it obvious that a transfer terminable at will by the transferor would not qualify as a sale, so do we. Where to draw the line between the two extremes is our problem.

Here the territorial assignee had an affirmative duty (a) to establish a district licensee within thirty days, and (b) to establish three district licensees thereafter. Not only were the forms of these licenses prescribed, but the taxpayer had an unlimited veto on the approval of any or all such district licenses. While such affirmative provisions may be compared to the 5,000 gallons of product required to be sold by Dairy Queen each season, or the minimum number of carts required to be sold in the six months period mentioned in Watson v. United States, supra, or even dismissed as unsubstantial, we think, realistically considered, they more closely resemble a licensor's control of a licensee than an assignor's sale of "all substantial" property rights.

But there are other and further reasons for the Tax Court's decision. Not only was the typical example of the territorial assignment of patent contracts in evidence, but likewise a December 23, 1949 contract between taxpayer and Exact-O-Matic Corporation, an Arizona corporation (dated only 1950, attached as Ex. 4–d to the Stipulation of Facts). This agreement refers twice to territorial franchises "already established or to be established." (¶¶ 2, 5.) If such prior territorial assignment of patents by taxpayers was intended to constitute a sale of all substantial rights, the language used in paragraph 1 of said December 1950 agreement is entirely inconsistent and incongruous. In that December 1950 agreement taxpayer represented that he was "the *sole* owner of the *entire* right, title and interest in and to those certain U.S. Patents * * * referred to * * * [as] * * * Exact-O-Matic System." (¶1, Ex. 4–d, Stipulation of Facts.) (Emphasis added.)

■ We thus are faced with the generally accepted rule that if there are present in the territorial license agreements, or in some closely related docu-ment which must be considered a part of the same transaction, factors which expressly negative an intent to make a transfer of the patent, the transaction cannot be held the equivalent of an assignment or sale. See Eterpen Financiera Sociedad de Responsabilidad Limitada v. United States, 1952, 108 F.Supp. 100, 124 Ct.Cl. 20, certiorari denied 1953, 346 U.S. 813, 74 S.Ct. 22, 98 L.Ed. 340; Rhodes-Hochriem Mfg. Co. v. International Ticket Scale Corp., D.C.Del.1932, 57 F.2d 713; Federal Laboratories, Inc., 8 T.C. 1150 (1947).

A further factor rightly emphasized by the Tax Court was that that which was transferred, if it were to be placed in operation, was required to use a certain wiring unit made by Remington-Rand to taxpayer's order. Title to this indispensable adjunct to the Exact-O-Matic was retained by taxpayer.

Another factor (which is commented upon in the Eterpen case, supra) is paragraph 12 of the "Territorial Assignment of Patent" relating to patent litigation. "Assignor agrees to defend at his own expense *any* litigation arising *within* or without the territorial area, challenging *his* right to use any of the aforesaid patents, etc." (Emphasis added.) Here, as in Eterpen, the agreement involved failed to expressly confer upon the assignee the right to sue for infringement of the patents in its own name. Of course, no express reservation to the contrary was included. Hence the assignment to use would ordinarily give assignee the right to sue jointly with the assignor, and the right to sell would ordinarily give the assignee the right to sue in his own name for infringement. Waterman v. Mackenzie, supra. Here the sole reference to the assumption by assignor of the obligation to defend *his* patents is persuasive of a license. We say persuasive, for admittedly such language is not conclusive. Pike v. United States, D.C.Conn.1951, 101 F.Supp. 100.

■ We concede the question may be close, but a careful examination of the evidence convinces us the Tax Court clearly had before it sufficient evidence of

**308**

the retention of rights in the patented and copyrighted system, and of limitations imposed on the transferees, sufficient to establish that *less* than "all substantial rights" had been transferred.

Taxpayer seeks throughout his brief to bring himself within the theory of Dairy Queen, supra, by urging that the restrictions and reservations came into being in order to protect the value of the system and to prevent the system from falling into the hands of unskilled non-accountants.

While the motives which prompt certain agreements may be wholly laudable from a business or an ethical standpoint, they do not excuse or palliate the provisions and definitions of the law which the Congress, in its wisdom, has seen fit to promulgate. Nor are we permitted to change the law because a taxpayer is a good citizen and had the best of intentions.

The judgment of the Tax Court is affirmed.